**FLORIDA ROCK INDUSTRIES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 266–82L.

United States Claims Court.

July 23, 1990.

---

John A. DeVault, III, with whom were C. Warren Tripp, Jr., Jane A. Lester, and John Tolson, Jacksonville, Fla., for plaintiff.

Fred R. Disheroon, with whom was David Kaplan, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This regulatory taking claim is before the court on remand from the United States Court of Appeals for the Federal Circuit, which affirmed in part and vacated in part the opinion of the first trial court.[1] After considering evidence presented at the original trial and additional evidence presented after remand, the court finds that the Army Corps of Engineers' denial of a permit to fill plaintiff's property resulted in a taking, and accordingly awards just compensation as mandated by the fifth amendment.

## FACTS

The facts underlying this case have been succinctly set forth by the appellate court,

---

1. The first trial was held before then-Chief Judge Alex Kozinski.

*Florida Rock Indus. v. United States*, 791 F.2d 893, 895–96 (Fed.Cir.1986), and are recited briefly below for the reader's convenience. The court relies on the findings of the district engineer of the Army Corps of Engineers (the Corps), as did the Federal Circuit.

Plaintiff, a large-scale miner of limestone, purchased a tract of 1,560 acres in Dade County, Florida in 1972, paying $2,964,000. The sole purpose for the acquisition was the mining of limestone; no other use or sale was ever considered. Because of a slump in the construction industry in South Florida, plaintiff did not attempt to mine the subject property until 1978, nor did it attempt to put the property to other use.

Shortly after the plaintiff's acquisition of the property but prior to the commencement of mining in 1978, Congress passed Public Law 95–217, 91 Stat. 1567 (Dec. 27, 1977), amending the Clean Water Act, 33 U.S.C. § 1251(a) (1988) and expanding the jurisdiction of the Corps to regulate activity affecting navigable waters. At the same time, § 404 of this law established a mechanism for applying for permits to discharge dredged or fill material into waters covered by the Clean Water Act. 33 U.S.C. § 1344 (1988).

Upon learning of plaintiff's mining activities, and in the belief that a § 404 permit was required, the Corps issued a cease and desist order, with which plaintiff complied. Plaintiff then applied to the Corps for a permit which would enable it to mine 98 acres. This would have fulfilled its needs for a three-year period. Although plaintiff would have preferred a permit to mine the entire 1,560 acre tract, the Corps had indicated it would consider applications covering no more than a three-year need.

On October 2, 1980, the Corps denied plaintiff's application covering the 98 acres, finding the permit would not be in the public interest. No appeal was taken under the Administrative Procedure Act, 5 U.S.C. §§ 701, ff (1988), and no further applications were submitted.[2]

### PRIOR PROCEEDINGS

The history of the prior proceedings in this case has been laid out at length in Senior Judge Nichols' opinion for the Federal Circuit, 791 F.2d at 896–97, and is summarized briefly below.

Following the district engineer's denial of plaintiff's permit application, plaintiff filed suit in the Claims Court, seeking just compensation for a regulatory taking, under the fifth amendment. The liability and damages aspects were bifurcated, and separate trials were held before Chief Judge Kozinski. At the conclusion of the trial on liability, the Chief Judge delivered an oral opinion, which later was modified and memorialized in a written opinion. *Florida Rock Indus. v. United States*, 8 Cl.Ct. 160 (1985). An order on valuation was issued after a trial on damages.

Chief Judge Kozinski found that, contrary to the Corps' finding, the activities proposed by plaintiff would not have polluted the water; he also found that there was no economically viable use for the property other than as a site for mining limestone. Based on these findings, he held that the government's action had resulted in a taking requiring just compensation. In fixing the amount of compensation to which plaintiff was entitled, Chief Judge Kozinski was persuaded by plaintiff's argument that the proper measure of damages was the immediate use value that had been lost, and in a subsequent order determined that the 98 acres in dispute were worth $10,500 per acre, or $1,029,000 for the tract.[3]

2. Nonetheless, plaintiff claimed that the entire parcel of 1,560 acres was taken as a result of the permit denial, because logic would indicate that if the Corps would not allow the mining of 98 acres, it would not permit the mining of the remaining 1,462 acres. Chief Judge Kozinski ruled that the only parcel before the Corps had been the 98-acre tract, and therefore the only land that could be the subject of this taking litigation was that tract. The Federal Circuit affirmed this holding.

3. Although the court ruled that the only land taken by the permit denial was the 98 acres, it valued the entire 1,560-acre parcel. In the valuation order, it was determined that as of the date of taking, 1,240 acres were worth $7,500

The Federal Circuit affirmed Chief Judge Kozinski's finding that the most that could have been taken was the 98–acre parcel, but vacated much of the remainder of the opinion and remanded for further proceedings. In doing so, the Federal Circuit Court noted:

> The trial judge failed to apply the evidence in a manner correct in all respects to determine whether he had an actual instance of a taking before him.... We remand for determination of the taking question according to right principles, as it would be improper for us to constitute ourselves fact finders and weigh the evidence ourselves.

791 F.2d at 894.

In addition to these general principles, the Federal Circuit found several aspects of the trial court's opinion contrary to the law. In particular, the Federal Circuit held that the trial court's inquiry into whether the proposed activity actually would have polluted the waters was an improper exercise of jurisdiction over a matter appropriate for review only by a district court under the Administrative Procedure Act. *Id.* at 898.

The appellate court also disapproved of the trial court's method of valuing the property potentially taken by looking at an immediate use value, as opposed to a fair market value. Specifically, the court ruled that it was clear error for the trial judge to exclude from consideration defendant's evidence of a potential investment market for the property. The court stated:

> Indeed, if there is found to exist a solid and adequate fair market value (for the 98 acres) which Florida Rock could have obtained from others for that property, that would be a sufficient remaining use of the property to forestall a determination that a taking had occurred or that any just compensation had to be paid by the government.

*Id.* at 903.

Defendant for the most part is correct that the Federal Circuit vacated Chief

per acre and 320 acres were worth $4,000 per acre, for a total of $10,580,000.

**4.** Additionally, the court has considered the method adopted by Chief Judge Kozinski in

Judge Kozinski's findings. However, there are at least two exceptions. The Federal Circuit expressly affirmed the trial court's determination that the 98–acre parcel is the only property in dispute. Additionally, the appellate court did not disturb his finding that the pre-"taking" value of the property was $10,500 per acre, and this court must accept that figure for determining both liability and damages.[4] *See, e.g., Fidelity & Deposit Co. v. USAFORM Hail Pool*, 523 F.2d 744, 759 (5th Cir.1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976) (a trial court, when conducting proceedings following a remand, cannot disregard its previous factual findings if those findings were not disturbed on appeal). The court disagrees with defendant that no further evidence may be introduced on remand. Had the Federal Circuit intended for this case to be decided on the existing record, it would have remanded with directions to dismiss. Without further evidence of fair market values, it would be impossible for this court to make a "determination of the taking question according to right principles." 791 F.2d at 894.

Thus, the court is faced with the following questions on remand: whether plaintiff had a legitimate entitlement to the proposed use of its property; if so, whether the Corps' denial of a § 404 permit denied the plaintiff the economically viable use of its land so as to constitute a taking under the fifth amendment; and, if so, the amount of compensation to which plaintiff is entitled. Central to the outcome of the latter two questions is a determination of the fair market value of plaintiff's property after the denial of its permit application.

Finally, it must be added that although the parties hold differing views on the court's role on remand, and there is room for valid disagreement in interpreting some appellate opinions in this area, the Federal Circuit could not have been clearer when it concluded:

> determining this value and finds that it is not clearly erroneous. As such, under the standard set forth in RUSCC 52(a), this prior determination will stand.

On remand, the court should consider, along with other relevant matters, the relationship of the owner's basis or investment, and the fair market value before the alleged taking, to the fair market value after the taking. In determining the severity of economic impact, the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored.

*Id.* at 905.

## DISCUSSION

### Plaintiff's Legitimate Entitlement to the Proposed Use of its Property

■ Defendant has maintained throughout the course of this litigation that even if plaintiff otherwise has successfully demonstrated that the denial of its permit application resulted in the loss of all economic value in its property, it is not a taking because plaintiff had no legitimate entitlement to use its property for the particular activity it sought to conduct. Defendant grounds its argument on the proposition that the government need not compensate "individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community." *Keystone Bituminous Coal Ass'n v. De Benedictis,* 480 U.S. 470, 489, 107 S.Ct. 1232, 1244, 94 L.Ed.2d 472 (1987) (relying on *Mugler v. Kansas,* 123 U.S. 623, 668–69, 8 S.Ct. 273, 300–01, 31 L.Ed. 205 (1887), in which the state prohibited a brewery from manufacturing beer, thereby rendering the brewery valueless). In other words, a property owner has no right to use its property as a nuisance.

In commenting on what has become known as the nuisance exception to the general rule that just compensation is required when the government regulates the value out of private property, the Court of Appeals for the Federal Circuit stated that "no one has a legally protected right to use property in a manner that is injurious to the safety of the general public." *Allied–General Nuclear Servs. v. United States,* 839 F.2d 1572, 1576 (Fed.Cir.1988) (citing *Mugler*). With respect to the application of the nuisance exception to this case, the Federal Circuit noted, "we may concede as a hypothetical, if Florida Rock produced on its tract a fluid as septic as Kansas then considered beer to be, and proposed to drain it into the Miami drinking water, this could be stopped without compensation." 791 F.2d at 900.

Although defendant's statement of the law is accurate, it does not apply to this case. First and foremost, the Federal Circuit noted that the Corps' decision that plaintiff's proposed activities would pollute the water was a "necessary hook for jurisdiction of the Army engineers, [and the pollution] is not claimed in the district engineer's decision to be by itself very serious." *Id.* at 904. The appellate court characterized Florida Rock as a "moderate and *pro forma* polluter," and distinguished it from "one who wanted to put toxic wastes in drinking water, [who] would encounter a balancing of public and private interests most unfavorable to his position and not likely to result in a compensation award." *Id.*

Second, even if the Federal Circuit's statements were not binding on this court, the court on its own is not persuaded that plaintiff's proposed activities would have constituted a nuisance so as to deny plaintiff its rights to just compensation.

Defendant introduced testimonial and documentary evidence that plaintiff's proposed use of the property would have endangered or destroyed some wetlands. Defendant contends that based on this evidence plaintiff's proposed activity would have increased the risk of contamination of the Biscayne Aquifer, the sole source of drinking water for the Dade County area, although even defendant does not contend that limestone mining actually would have contaminated the aquifer. No evidence was introduced at trial to support or even quantify this risk.

Notwithstanding this argument, it is clear from the court's aerial visit of the site that the proposed use of plaintiff's property would not have created any significant increase in the risk of contamination posed to the Biscayne Aquifer. The extensive

quarries in the area of plaintiff's property belie any claim that a nuisance is involved here. The court observed many operational limestone quarries and existing limestone pits in close easterly proximity to plaintiff's property. Furthermore, defendant concedes that if plaintiff had begun to mine before the 1972 amendments to the Clean Water Act went into effect, plaintiff would have been grandfathered in, and no federal permit would have been required.

Defendant's use of the nuisance exception here only obscures the real question, as well as the government's own interests in denying plaintiff a § 404 permit. The government's stated policy interest is the prevention of development in the vast wetland area at the western edge of Dade County's developed and developing sections. The wetlands there serve to protect and enhance the Biscayne Aquifer. As civilization has grown into this region over the last 100 years, there has been an ever greater amount of pressure on the Aquifer. This is so because the wetlands filter and recharge the Aquifer, while development has the opposite effect.

No one knows how much danger to or pressure on the Aquifer's ability to remain safe have been created by the last 100 years of development. However, it is not this court's function to decide the acceptable level of pressure or danger. The state or federal authorities well may decide that Dade County's development should be stopped forever at Krome Avenue or allowed to proceed another 100 miles to the west. It is this court's duty to decide which regulatory restrictions require just compensation under the fifth amendment.

Here, it is clear that the nuisance exception to the fifth amendment's requirement of just compensation is inappropriate. Rock mining of the type planned for plaintiff's property never has been considered a nuisance. In fact, it is in this area, as the court observed, the precursor of stylish, if not elegant, residential development. As the pits are mined out they are turned into small lakes. The surface ground formerly covering the limestone is used to raise the ground level so that homes can be built several feet above the mean high water line. This pattern of development extends in a great north-south band along the western edge of developing Dade County. The eastern edge of this band consists primarily of completed and occupied residential development. The western edge is populated by active limestone mining pits. Plaintiff's claim is occasioned by the fact that when it was about to begin its mining the governmental policy put an absolute limit on this western movement. This decision's correctness must be assumed in the context of a claim for just compensation. However, it has little to do with nuisance theory, an area developed by the common law courts of England hundreds of years past. Rock mining of the type at issue here is not considered a nuisance in this area. It certainly is not considered one several thousand feet away, where rock mining is proceeding happily apace. The government's uses of this argument, if adopted, would render the concept of a regulatory taking virtually meaningless. It also would severely limit the protection afforded by the fifth amendment, even in the case of a taking by direct physical invasion.

For the foregoing reasons, plaintiff's proposed use of its property would not have constituted a nuisance under *Keystone Bituminous*, *Mugler*, and *Allied-General Nuclear Servs.* Plaintiff therefore had a legitimate entitlement, but for the wetlands restrictions, to use its property in the manner proposed. As a result, if it is otherwise able to establish that the denial of its permit resulted in a taking, plaintiff should not be required to "sustain[ ] what may well be a permanent obligation to maintain property for public benefit, to carry the taxes and other expenses, and not to receive business income from the property in return." 791 F.2d at 904.

This determination does not call into question the findings of the legislature in enacting the Clean Water Act, nor the determinations of the Corps or other agencies that might have opposed the project. In fact, this determination is consistent with the appellate court's characterization of the Corps' findings. According to the Federal Circuit, "[t]he concern of the district engi-

neer [was] almost exclusively the continued existence of the wetland, not the temporary and moderate pollution incident to the occurrence of actual mining. It would be forensic semantics to characterize his decision as one against pollution...." *Id.*

All valid statutes and regulations exist for the public welfare. But the assertion that a proposed activity would be a nuisance merely because Congress chose to restrict, regulate, or prohibit it for the public benefit indicates circular reasoning that would yield the destruction of the fifth amendment. "The nuisance exception ... is not coterminous with the police power itself." *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 145, 98 S.Ct. 2646, 2669, 57 L.Ed.2d 631 (1978) (Rehnquist, C.J., dissenting). It cannot be forgotten that the fifth amendment "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *First English Evangelical Lutheran Church v. Los Angeles*, 482 U.S. 304, 304, 107 S.Ct. 2378, 2380, 96 L.Ed.2d 250 (1987).

As defendant concedes, not all valid § 404 permit denials are insulated from fifth amendment claims. In this case, the court finds no support for defendant's proffered characterization of the proposed use of this property as a nuisance.

### Denial of Economically Viable Use of the Land

In *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980), the Supreme Court indicated that a regulation, in that case a zoning law, as applied to a particular property may effect a taking if it does not substantially advance legitimate state interests (citing *Nectow v. Cambridge*, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928)), or if it "denies an owner economically viable use of his land" (citing *Penn Central*, 438 U.S. at 138 n. 36, 98 S.Ct. at 2666 n. 36). *See also United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985).

There is no fixed formula for determining when a regulation or its application denies an owner economically viable use of its land and thereby results in a taking. Rather, the Supreme Court has characterized the analytic process as one relying instead on ad hoc, factual inquiries into the circumstances of each particular case.... To aid in this determination, however, we have identified three factors which have "particular significance." (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the government action."

*Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224–25, 106 S.Ct. 1018, 1025–26, 89 L.Ed.2d 166 (1986) (citations omitted). *See also Keystone Bituminous*, 480 U.S. at 494–95, 107 S.Ct. at 1247 and cases cited therein.

In focusing on the extent to which the government's action has denied plaintiff the economic viability of its property the court may combine the first two of these factors. *See* 791 F.2d at 905. As a part of this analysis, the court must compare the value of the property before the government action with the value after the government action. "[I]f there is found to exist a solid and adequate fair market value ... which Florida Rock could have obtained from others for that property, that would be a sufficient remaining use of the property to forestall a determination that a taking had occurred...." *Id.* at 903. This market may be composed of "investors who are real but are speculating in whole or in part." *Id.* The court, however, may not consider "potential end uses or markets when the speculation is so remote or improbable that one would not invest his money in it." *Id.*

Before addressing the value of plaintiff's property prior to and after the government action, a brief comment on the character of the government action is warranted, although little has been made of it by the parties because of the particular facts and procedural posture of this case.

### Character of Government Action

Typically, an inquiry into the character of the government action addresses whether the interference with property involves physical invasion or interference by regulation; interference of the former type has been more likely to be considered a taking than the latter. *See further Keystone Bituminous,* 480 U.S. at 488–89 n. 18, 107 S.Ct. at 1244 n. 18.

In this case, the government has drawn a line in time, and has dictated that covered activity begun after a certain point is restricted. As defendant has conceded, if plaintiff had attempted to mine its property earlier, it probably would have been grandfathered in under the then-existing statutory scheme. Moreover, as the court noted earlier in this opinion, limestone mining operations that had begun prior to the amendments to the Clean Water Act were ongoing at the time of trial.

It must be kept in mind that the "determination that governmental action constitutes a taking, is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest." *Agins,* 447 U.S. at 260–61, 100 S.Ct. at 2141–42. Although it is permissible for a regulatory entity to determine that conduct begun prior to the effective date of certain regulations is not affected, such a determination may indicate, as it does in this case, that a single plaintiff should not bear a burden that should be borne by the public at large. Thus, to the extent the court has been asked to contemplate the character of the government action in this case, it is a consideration that weighs in plaintiff's favor.

### Value Before Government Action

■ In many cases, the economic impact of the regulation is measured by comparing the fair market value of the property before the government action with the fair market value of the property after the government action. Thus, the litigation on this issue often becomes a battle of real estate appraisers. Typically, real estate appraisers determine and adjust comparable sales to determine fair market values; in the absence of comparable sales, however, other methods for establishing the fair market value are accepted by the courts. *See, e.g., Foster v. United States,* 607 F.2d 943, 951, 221 Ct.Cl. 412, 426 (1979); *Yaist v. United States,* 17 Cl.Ct. 246, 260 (1989) and cases cited therein.

In this case, the court believes there were no comparable sales available. In the absence of such proof, plaintiff presented credible and competent evidence of the property's pre-permit-denial fair market value by adjusting the price it paid for the property in 1972 based on changes in the local economic environment. The court agrees with defendant that acquisition cost is rarely a basis for establishing the value of land prior to an alleged regulatory taking. In this case, however, the acquisition cost was used merely as a starting point for determining the value.[5]

Further, the court is convinced that although this method may not be the ideal one chosen by appraisal experts, it does provide an adequate basis for determining the fair market value of the property prior to the government action. As such, Chief Judge Kozinski's general acceptance of plaintiff's method, as modified somewhat by his calculations as explained in his oral ruling of May 7, 1985, is not clearly erroneous. Because this finding therefore meets the requirements of RUSCC 52(a), and because it was not disturbed on appeal, the pre-"taking" value of plaintiff's property is held to be $10,500 per acre.

5. Contrary to defendant's assertions, the adjustments from 1972 to 1978 did not have the effect of attributing to the United States the costs of lost opportunity, taxes and inflation. Plaintiff no longer argues that it may recover for the frustration of business expectations, nor could this court accept such an argument. *See* 791 F.2d at 903. Plaintiff's adjustments merely reflect the reality of the changing value of money and realty over time; to accept defendant's argument would undercut the meaning of any method of valuation, including the comparable sales approach, since the reasons for paying a certain sum for a particular piece of property include opportunity value, taxes, and the value of money.

*Value After Government Action*

■ The great majority of counsel's time and effort spent on remand has been directed at the question of the property's value after the denial of plaintiff's permit application.[6] Defendant argues that plaintiff has not proven that all economically viable uses would require a fill permit, nor has plaintiff shown that it applied for permits for uses other than mining, nor has plaintiff shown that any such permit applications have been denied. Defendant asserts that plaintiff's taking claim is not ripe because applications for relevant state permits never had been made, citing *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 186, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1985) for the proposition that until an owner has obtained a final administrative decision as to how the applicable rules and regulations will be applied to the property, a taking claim is premature. However, with respect to the federal administrative process, the Corps' denial of plaintiff's § 404 permit application was final. With respect to the state permit applications, there is no legal requirement for a party to expend time and money on what would clearly be an unnecessary and futile exercise. *Cf. Conant v. United States*, 12 Cl.Ct. 689, 692 ("It would serve no purpose to require claimant to exhaust administrative procedures before seeking judicial review when it is clear that resort to administrative action would be futile.").

■ It appears to the court, for several reasons including defendant's allegation that the highest and best use for the subject property is investment, that the most important of defendant's arguments is that plaintiff has failed to prove the absence of a market among real and knowledgeable investors aware of all restrictions on the land.[7]

■ Although defendant is correct that plaintiff has the burden of establishing the elements of its claim, including the diminution in the property's value, it would be patently unreasonable to require plaintiff to prove the total absence of any value, and more relevant to this case, the absence of a market for the property. This would require plaintiff to prove a negative, a logically impossible task. Moreover, it would be a hurdle which would make an illusion out of the fifth amendment. Instead, plaintiff's initial burden is to produce sufficient evidence of the absence of real value to shift the burden to defendant. Plaintiff in the instant case has met that burden.[8]

A brief review of what previously has transpired in this case is necessary to understand fully the parties' respective positions. The Federal Circuit noted that Chief

6. On remand, the court denied defendant's motion to exclude additional evidence, and heard additional testimony as to the fair market value of the property after the permit denial. Noting its continuing objection to the consideration of additional evidence, defendant argues that even with that new evidence plaintiff has failed to establish that there is no remaining economic use of plaintiff's property after the permit denial. For the reasons stated herein, the court disagrees.

7. In addition to its main arguments, defendant points out that plaintiff's principle, Mr. Edward Baker, believed the property to be worth over $10,000 per acre after the permit denial. Defendant also argues that plaintiff rejected three offers to purchase the property for substantial value after the permit denial. These offers consisted of a letter from an Arizona real estate broker proposing to purchase the tract for approximately $3.5 million, a subsequent letter from the same broker proposing to purchase the parcel in ten-acre tracts for $5 million over an

eight-year term, and a contract for the purchase of 160 acres for $325,000 with 20% down and the balance to be paid over ten years. There is no evidence that these offers were made by knowledgeable investors, nor whether the offerors were capable of consummating the purchase; plaintiff's unrefuted testimony was that it did not consider these offers to be "real." Regardless of the actual likelihood of these offers being real, however, neither they nor Mr. Baker's belief as to the value of the property, whether considered on their own or together, proves the existence of a "solid and adequate" market. Nor does the court find any persuasive evidence that there is a market for the property for purposes of hunting, recreation, or scientific study, other than among government entities which might be interested in acquiring the wetlands at the nominal price discussed *infra*.

8. For a further discussion of the parties' respective burdens of proof, see *Loveladies Harbor, Inc. v. United States*, 21 Cl.Ct. 153, 157–58 (1990).

Judge Kozinski premised his determination that a taking had occurred on a misinterpretation of the phrase "economically viable use." According to the appellate court, 791 F.2d at 901–03, the trial judge erroneously read into the case law the qualification that there be no remaining *immediate* use, and consequently excluded the testimony of the defendant's real estate appraiser that a market existed among knowledgeable speculators who would be "willing to forego immediate income in hope of long-term gain." *Id.* at 902. Instead, Chief Judge Kozinski accepted the testimony of plaintiff's economist, Dr. James C. Nicholas, who, according to the Federal Circuit,

> testified that "fair market value" subject to the regulation was a myth: the only buyers who would pay any substantial sum for the property were foreigners, unaware of the physical nature of the property and of the legal restrictions on its use, victims of fraud or self-deception.

*Id.* After indicating its belief that there might well be a market among investors willing to "bet" on the possibility that fill restrictions would be lifted in the future, the Federal Circuit held it was clear error for the trial court to accept Dr. Nicholas' testimony as determinative of the absence of such a market, and clear error not to consider defendant's appraiser's testimony. *Id.* at 903. Consequently, on remand this court was directed to determine whether there existed an actual market among real and knowledgeable investors aware of all restrictions on the land, the existence of which "would be a sufficient remaining use of the property to forestall a determination that a taking had occurred...." *Id.*

### (i) Valuation Methods

It must be stressed that the ultimate fact to be proven is the existence or absence of a market among knowledgeable investors, aware of all restrictions on the land. Reiterating the unreasonableness of requiring proof of a negative, the court is satisfied that plaintiff has produced strong evidence of the lack of real knowledge on the part of purchasers. This evidence certainly is sufficient to shift the burden of production to

defendant. Defendant, however, overlooks the importance of the purchaser's knowledge.

As the Federal Circuit expressed, the evidence must show "a solid and adequate fair market value." *Id.* at 903. Because fair market values are premised on transactions between *knowledgeable* parties, and because the appellate court stressed this component of the analysis in this dispute, defendant's failure to provide evidence of the purchaser's knowledge renders its testimony unpersuasive.

To fully appreciate the conflict in the parties' positions, a focus on the meaning of fair market value is in order. By industry definition, market value is:

> The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.

American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 19 (9th ed. 1987). Intrinsically linked to the determination of fair market value is a determination of the highest and best use. This is defined by the industry as, "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." *Id.* at 269.

The court is faced with conflicting real estate appraisals, prepared by two highly credible experts. Both hold MAI designations (Member of the Appraisal Institute) from the American Institute of Real Estate Appraisers, and are certified under the Institute's continuing education program. Both compared the subject property with other acreage within what was identified as the two-by-ten mile strip. The differences in their respective appraised values of the land and in their determinations of the highest and best use for the property are

attributable to differences in methodology, and, ultimately, to a difference in focus.

In brief, plaintiff's expert, with the assistance of a well-qualified statistician and an experienced real estate market researcher, employed a statistical analysis of a census of property holders in the region to determine knowledge and motivation of purchasers of "comparable" property. Defendant's expert identified transactions of property it determined were objectively comparable, largely assumed knowledgeable purchasers if the transactions had been at arms-length, and determined an average per-acre price paid. Both appraisers verified the sales, in accordance with the practice of their industry, but plaintiff's appraiser attempted to verify the knowledge of the landowners, while defendant's appraiser verified that the sales were arms-length transactions and, with little exception, assumed knowledge on the part of the purchasers.

■ Not surprisingly, in light of the different approaches taken, the experts' respective conclusions are different. Plaintiff's expert contends there is no market among knowledgeable investors, and that the highest and best use for the property would be as a site for "future recreational/water management" purposes, at a nominal value of $500 per care to a government entity. Defendant's expert alleges there is a market among knowledgeable investors, that the highest and best use for the property therefore would be investment, and claims that a value of $4,000 per acre is appropriate.

If this were a jury case, the court would be required to "screen the proffered potential uses and exclude from jury consideration those which have not been demonstrated to be practicable and reasonably probable uses." *United States v. 341.45 Acres of Land*, 633 F.2d 108, 111 (8th Cir.1980), *cert. denied sub nom. Bassett v. United States*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981) (quoting *United States v. 320.0 Acres of Land*, 605 F.2d 762, 815 (5th Cir.1979)). By analogy, the court sitting as a finder of fact must discount proposed uses that do not meet a "showing of

reasonable probability that the land is both physically adaptable for such use *and* that there is a demand for such use in the reasonably near future." *Id.* (emphasis in original) (relying on *Olson v. United States*, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)). In this case, the court must discount the proposed use of speculation as being neither practicable nor reasonably probable.

It may well be that this land may some day be worth defendant's proposed $4,000 per acre, or $50,000 per acre, or 100 times that, when Miami has 50 million residents in the future. However, while land speculation, dreams of avarice, and real estate promoters may proceed by such rules, this court must value this property by a fair and realistic measure. What it *might* be worth is not an adequate government argument to the present lack of a real market with knowledgeable investors. This is further emphasized by the following excerpt of the direct examination of defendant's expert, Mr. Theodore C. Slack:

Mr. Disheroon: Have you had experience in other areas regarding property of this type?

Mr. Slack: Of wetlands?

Mr. Disheroon: Yes, or just property that is just located far out where there were active real estate market[s]?

Mr. Slack: Yes. One, for example, is Arizona. I do a lot of work out there. Ten years ago, people were buying desert, with no roads, no water, no sewer, no electricity, and they were paying five thousand dollars an acre. I knew they were nuts. But unfortunately or fortunately, I guess, ten years later they were getting fifty thousand dollars an acre for the same land. Scottsdale annexed it and Phoenix has a tremendous population growth and all of a sudden these people made a lot of money. I had to send MAI buttons, so I did not buy any of that land, but those guy[s] did and I suppose they are retired or having lunch with Donald Trump or something, I do not know.

Mr. Disheroon: In your experience, if you were asked to evaluate that property

at the time it was in the middle of the desert, using the standards of the appraisal institute where there was an active market but the purpose was holding it for investment, would you have said that there [was] no market value to that property and it was worthless?

Mr. Slack: No. The reason I was out there is I was appraising some of that property. I said people are paying five thousand dollars an acre. I have all these fancy badges on, so I am too smart to do that. If that is what they are paying, that is what it is worth. I appraised it for five thousand. When I appraised it last year, I appraised it for fifty thousand.

Mr. Disheroon: Time and location are important factors in the future use as to which property may be put?

Mr. Slack: Yes. By the time it was selling for fifty thousand, of course they were building two hundred thousand dollar houses on it. I could not foresee that in 1975 and 1978. People that bought the property could not either. They just knew that it was a growth area, and said, "hey, let us take a shot," and they won.

The Court: Is the lesson to that, irrational speculation sometimes works?

Mr. Slack: I do not know, Your Honor, what is irrational. I think some of the people that have made the most money in the United States [are] saying that more fortunes have been made in real estate than any other form of investment. There is no guarantee. I have bought property and sold it for three times what I paid for it. I have some property in Tennessee that is not worth anymore now, than it did when I bought it ten years ago. You just do not know. I guess that is why they call it "speculative," because it is uncertain.

The Court: I guess for the example of the people that we found to have bought in property outside of Phoenix, that was next to Scottsdale, we might find someone in New York who had bought property in New York, and has the property not worth half of what it was when he bought it.

Mr. Slack: Yes. That is certainly true. I am not the world's biggest investor, but I do some and sometimes I do find and sometimes I do not. That is just the way the free market works. It is not a controlled market and nothing is guaranteed.

If the fact that knowledgeable investors thought the Arizona desert was valueless 30 years ago (and it turned out otherwise) can be used by the defendant to validate speculation of the wildest sort as providing an adequate market, then the very concept of *fair* market value is cast aside.

■ Defendant also takes issue with plaintiff's admittedly novel appraisal procedure. Among its many criticisms, defendant vehemently claims that the survey questionnaire was invalidly designed to elicit responses showing that the landowners purchased the property without knowledge of restrictions on its use and development, and was not intended as an objective measure. In addition, argues defendant, the critical questions did not address whether the purchasers had knowledge at the time of purchase, but, rather, whether they believed they had knowledge of restrictions at the time the survey was taken.

It is true, as defendant points out, that the method used by plaintiff's experts is not part of the typical comparable sales approach employed in eminent domain cases. Usually, it may be adequate to presume knowledge of all legal restrictions on the part of purchasers in arms-length transactions. In this case, however, the parties were aware of the importance placed by the Federal Circuit on the knowledge component. The reason for this is the potential effect on the mandate of the fifth amendment created by South Florida's almost proverbial land sales tradition. If knowledge of restrictions was not an important component of the evidence in this case, then the protection of the taking clause might well be meaningless in many high growth, rapidly developing areas where widespread land mass-marketing schemes abound. The appellate court must be understood to have intended that a par-

ticular inquiry be made into the knowledge of those who make up the potential market. Plaintiff's method, while not a certain one for establishing the existence or absence of knowledge, is a reasonable one under the circumstances.

In the absence of an available vehicle for traveling back through time to 1980, this only could be done by drawing reasonable inferences from what people today believe they know. The evidence in this case indicates that the Corps' jurisdiction over the wetlands and the resulting restrictions on development are more widely known today than they were a decade ago; thus, it is reasonable to conclude that if property owners were unknowledgeable as to the legal restrictions on their land in 1988, when the survey was taken, they were no better informed, and likely worse, when they acquired the property.[9]

■ The court also would note that, contrary to defendant's implication, purchasers cannot be presumed to have had knowledge on the basis of the representations in their deeds, because unlike restrictive covenants, neither federal statutory provisions nor Corps' regulations would have appeared in deeds.

■ Plaintiff is correct when it points out the difference between price paid and market value. Because defendant's testimony essentially is nothing more than an informed extrapolation of prices paid, and because it does not sufficiently take into consideration the knowledge of the purchasers, it is not a basis for determining market value or the existence of a market, in this case. It must be noted, however, that this does not mean defendant's method is incorrect as a matter of law; rather, in this particular case, where the appellate court has stressed the importance of a knowledgeable market, plaintiff's method is a more appropriate one. This is espe-

cially true given the history of Florida land development.

### (ii) Collateral Estoppel

■ Defendant additionally argues that this court is bound under the principle of collateral estoppel to accept the state court's determinations made in response to a contested tax assessment, *Florida Rock v. Bystrom*, 485 So.2d 442 (Fla.1986), with respect to the existence of a solid and adequate investment market. The doctrine of collateral estoppel is required when:

> (1) the issues to be concluded are identical to those involved in the prior action; (2) in that action the issues were raised and "actually litigated"; (3) the determination of those issues in the prior action was necessary and essential to the resulting judgment; and (4) the party precluded ... was fully represented in the prior action.

*DWS, Inc. v. United States*, 18 Cl.Ct. 453, 458 (1989) (quoting *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569 (Fed.Cir.1983)).

Defendant's argument fails because the first enumerated requirement, above, is absent. Contrary to defendant's implication, valuation for purposes of state taxation and valuation for determining the scope of the protection afforded by the United States Constitution are not identical issues. Each state expresses unique concerns by the way in which it values property for taxation; as a result, the same property taxed under Florida's provisions may be valued quite differently under New Jersey's, for example. The inviolable mandate of the fifth amendment, however, does not permit such variety. Because plaintiff is not collaterally estopped for this reason, the court has not considered whether the other requirements of the doctrine have been met, nor does the court inquire into

---

**9.** At the risk of obscuring the forest for the trees, the parties spent a great deal of time at trial and in their post-trial submissions attacking and defending the specific questions in the survey and the follow-up telephone inquiries that were made in several instances. When viewing the forest, however, the court is per-

suaded that the survey results, coupled with the legal reality that no fill is permitted without the Corps' permission, unquestionably indicate that those who acquired the property during the relevant time period cannot be considered to have been knowledgeable purchasers.

the merits of the state court's determination.

### (iii) Real Market Issue

Finally, the court would note that it rejects defendant's contention that the Federal Circuit indicated its belief that there was a market made up of knowledgeable investors. The particular passage on which defendant relies is as follows:

> Since the tract was not listed for sale, the $4,000 per acre offer, the frequent inquiries, and the assessed value, must have reflected interest of knowledgeable people, not foreigners or gulls. There may be a question what knowledgeable buyers would have paid, but that they would have paid some substantial figure seems certain.

791 F.2d at 903. In light of the Federal Circuit's direction to determine whether there has been a taking in this case under the proper legal test, and in light of its assertion that it expressly was not serving as fact-finder, the above-quoted passage must be read as referring to what the trial court's conclusion would likely be *in the absence of any further evidence from plaintiff.* This interpretation is supported by the court's reading of the appellate court's opinion as requiring the introduction of additional evidence on remand.

### (iv) Summary

After carefully reviewing the appraisal reports submitted, and observing the appraisers and other experts who testified on remand, the court is convinced that the legal requirement that any investment market be among investors with knowledge of the restrictions on the land has not been met. In view of this finding, and in the absence of any other economically viable use for the property, the court accepts plaintiff's position that the value of the parcel remaining after the denial of its permit applications is $500 per acre.[10]

### Government's Liability

It is well-established that whether the application of a regulation results in a taking is highly fact-specific, and is not subject to analysis by a set formula. *Penn Central,* 438 U.S. at 128, 98 S.Ct. at 2661. It is "a question of degree—and therefore cannot be disposed of by general propositions." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 416, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922).

In order to determine whether the economic impact of a regulation on plaintiff's property results in a taking under the fifth amendment, the court must compare the value taken from the property with the value remaining. *Keystone Bituminous,* 480 U.S. at 497, 107 S.Ct. at 1248. For plaintiff to prevail here, the result of such a comparison must indicate more than a mere diminution in value, because "[g]overnment could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal,* 260 U.S. at 413, 43 S.Ct. at 159. When "regulation goes too far," however, the fifth amendment requires just compensation. *Id.* at 415, 43 S.Ct. at 160.

In this case, the value of the property in fact has been substantially reduced as a result of government action. The value of the property before the taking was $10,500 per acre; the value of the property after the permit denial was $500 per acre, resulting in a diminution in value to plaintiff of 95%. The magnitude of the diminution is exacerbated by the fact that the $500 per acre figure represents a reasonable estimate of what a government entity could be expected to pay for the property, and is not the product of negotiations between a willing buyer and seller under no duress.

A substantial reduction in value, however, in and of itself is not a sufficient basis for concluding that a taking has occurred. *See, e.g., Penn Central,* 438 U.S.

---

**10.** The court agrees with plaintiff that all real property must have some value. In light of the evidence presented, and in the absence of any contradiction by defendant, the court agrees that $500 per acre is a reasonable nominal value which the property would have to a government entity.

at 131, 98 S.Ct. at 2662. A further consideration should be the property owner's basis or investment in the property. *Florida Rock*, 791 F.2d at 905. "The owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored." *Id.*

In this case, there is no dispute that plaintiff purchased the property for the sole purpose of limestone mining; there is virtually no other business by which the plaintiff could "recoup its investment or better, subject to the regulation." Simple division indicates that plaintiff paid approximately $1,250 per acre for the entire 1,560 acre tract in 1972. Although this of course does not represent plaintiff's basis in 1980, nor is it representative of what the 98–acre parcel would have cost had it been acquired separately, it is used here to illustrate the very substantial impact on plaintiff's investment. The fact that plaintiff has had to purchase other property to meet its mining needs further illustrates the economic impact.

### *Damages*

 When property is taken by the government, the proper measure of just compensation is said to be the property's fair market value at the time of the taking. *See, e.g., Yuba Natural Resources v. United States*, 904 F.2d 1577, 1580 (Fed.Cir. 1990) (citing *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 474, 473–74, 93 S.Ct. 791, 794, 794–95, 35 L.Ed.2d 1 (1973)) (comparing the measure of damages in permanent and temporary takings).

Although the property retains a residual value of $500 per acre, payment of the full fair market value at the time of taking effectuates the purpose of an action in inverse condemnation, which is to produce a result comparable to the one that would have been reached had the government directly condemned the property. In light of the finding that the fair market value of the property was $10,500 per acre, for the 98–acre parcel, plaintiff is entitled just compensation in the amount of $1,029,000, plus interest from the date of taking.

## CONCLUSION

Based on the foregoing, the court concludes that the denial of plaintiff's § 404 permit application effected a taking of 98 acres of plaintiff's property. The parties have agreed that the date of any taking was October 2, 1980. To fulfill the mandate of the fifth amendment, therefore, the court awards plaintiff $1,029,000 plus interest from October 2, 1980. Plaintiff will tender the deed to the 98 acres upon the satisfaction of the judgment.

The entry of judgment will be stayed pending the determination of attorneys fees and costs to which plaintiff is entitled pursuant to 42 U.S.C. § 4654 (1988). Plaintiff is to file any such claim within 60 days from the filing of this opinion.

IT IS SO ORDERED.