**Harry L. BOWLES, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 303–88L.**

United States Court of Federal Claims.

March 24, 1994.

38

Kenneth S. Wall, Houston, TX, for plaintiff.

John S. Gregory, Washington, DC, Dept. of Justice, Environment and Natural Resources Div., for defendant.

SMITH, Chief Judge.

## OPINION

This case presents in sharp relief the difficulty that current takings law forces upon both the federal government and the private citizen. The government here had little guidance from the law as to whether its action was a taking in advance of a long and expensive course of litigation. The citizen

likewise had little more precedential guidance than faith in the justice of his cause to sustain a long and costly suit in several courts. There must be a better way to balance legitimate public goals with fundamental individual rights. Courts, however, cannot produce comprehensive solutions. They can only interpret the rather precise language of the fifth amendment to our Constitution in very specific factual circumstances. To the extent that the constitutional protections of the fifth amendment are a bulwark of liberty, they should also be understood to be a social mechanism of last, not first resort. Judicial decisions are far less sensitive to societal problems than the law and policy made by the political branches of our great constitutional system. At best courts sketch the outlines of individual rights, they cannot hope to fill in the portrait of wise and just social and economic policy.

Plaintiff, Harry L. Bowles, filed this case *pro se* seeking just compensation under the 5th Amendment for one home building lot in a Texas subdivision.[1] The basis of his complaint is that the Army Corps of Engineers' (Corps) denied plaintiff a 404 permit to fill his lot so that he might install a septic system as required by his subdivision to build his home. Plaintiff's property is considered a wetland by the Corps and a permit from the Corps is thus required to place fill, such as clean sand, on it. The Corps' action was taken pursuant to its jurisdiction under §§ 301 and 404 of the Clean Water Act, 33 U.S.C. §§ 1311, 1344 (1988).[2] Mr. Bowles alleges that without the ability to place fill over substantially all his lot, it has no value. Put another way, all economically viable use of his property was destroyed because without fill he could not build his home. And a site for a single family residence was the only real use of this relatively small piece of land. Plaintiff argued that all his neighbors in the subdivision were allowed to place fill on their property for the purpose of installing septic systems. Trial on plaintiff's complaint was held in Houston, Texas. Earlier in the litigation the court denied the parties' cross motions for summary judgment. *Bowles v. United States*, 23 Cl.Ct. 443 (1991).[3] The court earlier denied defendant's ripeness challenge by order dated July 24, 1990. For the reasons set forth in this opinion the court finds that plaintiff's property was taken since the denial of the 404 permit made the property worthless. The court awards plaintiff $55,000.00 as just compensation plus interest compounded annually from October 26, 1984.

### Facts

In 1970, Harry L. Bowles purchased a home on Follet's Island in Brazoria County, Texas, in a subdivision known as Treasure Island. The home was located at Lot 18 on Schooner Drive in section II of Treasure Island. Section II of Treasure Island is essentially a series of parallel streets running east-west.

---

1. The United States Court of Appeals for the Fifth Circuit transferred plaintiff's "takings" claim to this court. *Bowles v. United States Army Corps of Engrs.*, 841 F.2d 112 (5th Cir.1988).

2. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *Deltona Corp. v. United States*, 657 F.2d 1184, 228 Ct.Cl. 476 (1981); *NRDC v. Callaway*, 392 F.Supp. 685 (D.D.C.1975) (discussing the Corps' definition of and jurisdiction over "wetlands").

3. During this stage of the litigation Mr. Bowles continued to represent himself but obtained counsel just prior to trial.

*See* Plaintiff's Exhibit 7, p. 3; Plaintiff's Exhibit 27A–D; Defendant's Exhibit 1, p. 2; Defendant's Exhibit 88.

The streets are separated by canals that connect to a westwardly body of water known as Cold Pass which leads to the Gulf of Mexico. Residential lots are located on both the north and south sides of each street so that the back of each lot has footage on one of the several canals. However, some of the western most lots on each street have a more desirable waterfront view because of footage directly on Cold Pass.

In 1980, Bowles took what he believed to be an opportunity to improve his view of Cold Pass by acquiring an undeveloped lot on the south side of the southern most street in section II of Treasure Island, Lot 29 on China Clipper Drive.[4] Although a question arose late in the trial as to whether Lot 29 was in the subdivision, the court concludes that the only supportable factual finding after considering all the evidence is that Lot 29 is within the Treasure Island subdivision.

In defendant's post-trial brief it asked the court to take judicial notice of a certified copy of a 1967 re-plat of section II of the Treasure Island subdivision that excludes Lot 29 from the subdivision. The court denied the motion and the admission of any post-trial evidence. Notwithstanding, according to the government's theory of the case, if Lot 29 was re-platted out of the subdivision Bowles could sue to get the deed restrictions lifted, thereby making its alter-

---

4. Bowles acquired Lot 29 from River Oaks Bank & Trust Company through its agent and Bowles' personal friend, Jack Lindsey. Originally, Bowles was only interested in a straight purchase of Lot 29, but subsequently agreed to a different arrangement. Bowles accomplished his acquisition of Lot 29 by trading his existing Schooner Drive home in the interior of the subdivision for ten undeveloped lots (Nos. 29–39) on China Clipper Drive. Although Bowles owns other property in the area, the government has not argued that his other holdings in the vicinity should be included in the denominator of the "diminution in value" calculus. In any event, the Supreme Court would seem to disapprove of such an approach. *See Lucas v. South Carolina Coastal Council*, 505 U.S. ——, —— n. 7, 112 S.Ct. 2886, 2894 n. 7, 120 L.Ed.2d 798 (1992) (commenting that the inclusion of the taking claimant's other holding in the vicinity is an "extreme—and ... unsupportable—view of the relevant calculus"); *see also* Laura M. Schleich, *Takings: The Fifth Amendment, Government Regulation, and the Problem of the Relevant Parcel*, 8 J.Land Use & Envtl.L. 381 (1993).

native proposal economically viable.[5]

However, in the court's view the government misunderstands the "reasonable investment-backed expectations" analysis that may apply in this case. Whether or not Lot 29 is within the subdivision today is not a question that can be answered with physical evidence. It was clearly originally in the platted area. It is on a subdivision street. It is separated from any other subdivision by a considerable distance. Plaintiff submitted a certified plat map showing it within the subdivision at trial. The defendant submitted no contrary evidence at trial after a long period of pre-trial discovery. And, perhaps, most significantly the evidence showed that a reasonable investor would have considered it part of the subdivision.

All the relevant documents pertaining to Lot 29 indicate that it is in the subdivision. The 1964 plat map, certified by the county as true and accurate in 1991, indicates Lot 29 is in the subdivision. The actions of all the local regulatory entities indicate Lot 29 is in the subdivision. Therefore, in the court's view a reasonable investor in 1980 would have certainly concluded that Lot 29 was in the Treasure Island subdivision.

Lot 29 is essentially a waterfront lot with an unobstructed view of Cold Pass. There is a more westwardly lot—Lot 28—that appears on the plat map of Treasure Island. However, over the years Cold Pass has substantially eroded Lot 28 effectively rendering it useless except possibly for the construction of a pier. It is not large enough for a residence.

Bowles planned to build a single family home on Lot 29 as his permanent retirement residence. Bowles believed he could build on Lot 29 as long as he received approval from various local regulatory entities. In fact, building a single family residence in conformity with the neighborhood seems to be the only way Bowles could comply the restrictive covenants in his deed. In addition, Lot 29 is directly across the street from similar single family homes.

Bowles testified that in order to build on his lot he would need approval from at least two local regulatory entities: (1) the Treasure Island Municipal Utility District (TIMUD), and (2) the San Luis Pass Architectural Control Commission (Architectural Commission).[6]

TIMUD is a local government organization that supervises the water and sewage operations of the subdivision. TIMUD's approval must be obtained for any proposed sewage disposal system within the subdivision before any lot receives a water hook-up. TIMUD's main concern in approving sewage disposal systems is the prevention of pollution from septic effluent.[7] Mr. Bowles proposed a below ground septic system that required fill, and testified that his discussions with TIMUD board members indicated that approval of his proposal was certain. As a past president of TIMUD Mr. Bowles was very familiar with TIMUD's personnel, policies, and procedures.

The Architectural Commission is charged with enforcing the deed restrictions and aesthetic uniformity of construction within the Treasure Island subdivision. They approve or deny proposed designs for single

---

5. Because the court finds the government's alternative financial infeasible this hypothetical has little relevance. *See infra* section II.A.

6. Bowles also needed a State Water Quality Certification from the Texas Department of Water Resources. However, the government concedes this was issued and was submitted, as required, with Bowles' 404 permit application to the Corps.

In addition, Bowles needed a building permit from Brazoria County's Flood Plain Administrator. However, the uncontroverted testimony of the current Brazoria County Flood Plain Administrator, Penny Sturdivant, was that if Bowles

received a 404 permit her office would have issued a building permit.

7. The evidence indicates that TIMUD disfavors, if not prohibits, above ground sewage disposal systems because of the potential risk of pollution in a flood. Moreover, a below ground system in the subdivision requires fill so that the system is sufficiently removed from the underground water table and adjacent waterways. Additionally, a below ground septic system is the exclusive type of sewage disposal system that exists within the subdivision. A central aspect of the government's case is that a holding tank is a realistic alternative on Lot 29. There was virtually no evidentiary support for this proposition.

family residences within the subdivision. One of the Architectural Commission's main concerns is to eliminate vegetation from beneath houses, and standing water on property. Mr. Bowles testified, and the documentary evidence confirms, that he could not comply with the Architectural Commission's requirements or the deed restrictions without completely filling Lot 29.[8] But for this, the Architectural Commission would have approved of the residence Bowles' proposed for Lot 29.

Until 1981, Bowles was actively involved in the Treasure Island community, and was generally familiar with the Corps' authority and permitting process. He served on the board of directors, and eventually served as president, of TIMUD. On a couple of occasions TIMUD applied for permits from the Corps for the purpose of dredging canals within the subdivision. Also, around 1975 Bowles founded the Gulf Coast Wildlife Conservation Association (GCWCA), a watch-dog conservation group consisting of Treasure Island residents. GCWCA's primary goal is to resist the construction of oil-drilling structures and gas pipelines in the open navigable waters around Treasure Island. To accomplish this goal GCWCA monitors permit applications submitted to the Corps for the construction of projects in the waterways of the immediate geographic area. Bowles' involvement with TIMUD and GCWCA was his first exposure to the Corps' permitting process.

Mr. Bowles testified that he was not aware of any other lot owner in the subdivision ever applying to the Corps for a fill permit in order to build on their property.[9] There is no evidence in the record to contradict Bowles' testimony in this regard. Mr. Bowles eventually learned of the Corps' jurisdiction within the subdivision through happenstance. In the Spring of 1980, Bowles arranged a meeting with the Corps to discuss the possibility of developing a separate 16–acre tract that Bowles had previously acquired in 1979. This tract was located adjacent to the Treasure Island subdivision. At this meeting the Corps representative told Bowles he would never get a permit to develop the 16–acre tract. Bowles challenged this conclusion by asking why it was that he could build on Lot 29, which had the same topography, without needing a permit from the Corps. The Corps' representative responded, to Bowles' surprise, that he also needed a permit to build on Lot 29. This infuriated Bowles because he was not aware of any other lot owner in the subdivision ever having to apply for a fill permit from the Corps. However, Bowles eventually did apply for a fill permit and was officially denied on October 26, 1984. However, there was evidence of other owners in the subdivision placing fill on their property to build septic systems after 1980 and 1984. A series of lawsuits ensued, culminating in the instant complaint.

At trial both sides presented expert appraisal testimony, and both appraisers

---

8. Plaintiff's Exhibit 18 is a letter to Bowles from James A. Fulmore, Chairman of the Architectural Commission and states in pertinent part:

   In keeping with the enforceable deed restriction of Treasure Island, *we must insist that all of your Lot No. 29 be filled and sodded with grass to maintain the aesthetic value of the property.* Leaving weeds under the house will violate the restriction of "keeping all grass mowed and lawns well kept."

   *In addition, by not filling under the house you will create a shaded area combined with the weed patch that will harbor and promote a real health hazard providing mosquito breeding, rodents, etc.* Allowing you to build on a lot that is not filled will itself be unsightly and could harm property values in the subdivision. We would be setting a precedent which would allow other potential homeowners to cut corners and save a little money by not properly elevating the lot for construction.

   We feel that by not filling the lot to either support a well maintained lawn or smooth concrete surface will constitute a violation of the deed restrictions....

   Plaintiff's Exhibit 18 (emphasis added).

9. However, on the last day of trial the government offered as evidence a 1977 permit application—which was approved—to bulkhead a lot within the subdivision. The court denied admission of the exhibit because of its untimeliness, and because it would be unfair to allow plaintiff no chance for discovery or analysis of the document. However, this one isolated incident tends to support rather than rebut Bowles contention that a reasonable purchaser would have assumed no Corps jurisdiction within the subdivision. Bowles also testified that after 1980 and 1984 his neighbors were allowed to use fill to build septic systems on their properties.

agreed that the only economically viable use of Lot 29 was for the construction of a single family residence. However, only the plaintiff's appraiser expressed an opinion as to the value of Lot 29 before the alleged taking. Based on comparable sales in the area, he concluded the value of Lot 29 was approximately $70,000.00.

Both appraisers testified as to the value of Lot 29 after the alleged taking. The plaintiff's appraiser concluded that Lot 29 had no remaining value, but defendant's appraiser concluded that Lot 29 had a remaining value of approximately $4,500.00. This conclusion was based on an alternative use proposed by the government.

The government's alternative proposal assumed Bowles could build a house on stilts and install a holding tank sewer system without filling Lot 29. The government's appraiser valued Lot 29 under these assumptions at $17,500.00. However, the appraiser discounted this figure by the present value of the cost of maintaining a holding tank on the property over a period of 25 years. The government's appraiser based his final estimate of value on the following figures:

```
Value Before Holding Tank Discount .......... $17,500.00
    *Less Holding Tank Discount
        Usage
                Summer (4 months) ..............  8,000 gallons
                Other (8 months) ...............  8,000 gallons
                Total Annually .................. 16,000 gallons
        Disposal Cost ........................ $.07 per gallon
            ($.07 × 16,000)
        Total Annual Cost .................... $ 1,120.00
    *Total Present Value Discount
    (25 year period) ........................     $13,000.00
_____
ESTIMATE OF FAIR MARKET VALUE
($17,500.00 LESS $13,000.00) .................     $ 4,500.00
```

However, plaintiff presented credible and persuasive expert testimony that a holding tank system could use as much as 15,000 gallons *per month*, and that disposal costs were averaging *$.15* per gallon. Therefore, even a small variation in the usage and costs figures could result in Lot 29 having a negative value even under the government's own alternative. Also, defendant's appraiser assumed only seasonal use, conceding that Lot 29 would not be marketable as a permanent residence under the government's alternative because the cost of maintaining the holding tank would be prohibitively expensive.

### Discussion

I. **General Principles.**

&#9608; The fifth amendment of the United States Constitution states in pertinent part, "nor shall private property be taken for public use, without just compensation." [10] When considering taking claims based upon regulation rather than physical appropriation Justice Holmes declared: "the general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). The justification for this rule is that deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation. *See San Diego Gas & Electric Co. v. San Diego,* 450 U.S. 621, 652, 101 S.Ct. 1287, 1304, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting). No set formula exists to determine whether compensation is

10. There is no dispute in this case concerning the "public use" aspect of the takings clause. The plaintiff here is not contesting the legitimacy of the government's interest in preserving wetlands. The issue before the court here is whether compensation is due this plaintiff for his particularized loss.

constitutionally due for a government restriction on property. *See, e.g., Florida Rock Industries v. United States,* 18 F.3d 1560, 1568–70 (Fed.Cir.1994). What emerges from the case law at a constitutional minimum is that under the guise of regulation government cannot take from a property owner the core value of the property, leaving the owner with only a hollow deed. *Hendler v. United States,* 952 F.2d 1364, 1373 (Fed.Cir.1991). Nor can it force a discrete minority or single individual to bear the costs of public goods that should be borne by society as a whole. *See Florida Rock,* 18 F.3d at 1570–71 (Fed. Cir.1994).

Moreover, "[n]othing in the language of the Fifth Amendment compels a court to find a taking only when the Government divests the total ownership of the property; the Fifth Amendment prohibits the uncompensated taking of private property without reference to the owner's remaining property interests." *Florida Rock,* 18 F.3d at 1568 (Fed.Cir.1994). The Court of Appeals for the Federal Circuit recently held:

Nothing in the Fifth Amendment limits its protection to only 'categorical' regulatory takings, nor has the Supreme Court or this court so held. Thus there remains in [some] cases ... the difficult task of resolving when a partial loss of economic use of the property has crossed the line from a noncompensable 'mere diminution' to a compensable 'partial taking.'... What is necessary [in such cases] is a classic exercise of judicial balancing of competing values.

*Florida Rock,* 18 F.3d at 1570 (Fed.Cir.1994) (footnotes omitted).

The Supreme Court also recently addressed regulatory takings in *Lucas v. South Carolina Coastal Council,* 505 U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). In *Lucas* the Court held that a categorical taking

occurs when government regulation of property denies a landowner *all* economically beneficial or productive use of the land. *Lucas,* 505 U.S. at ——, 112 S.Ct. at 2893 (citing *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141–42, 65 L.Ed.2d 106 (1980); *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987); *Keystone Bituminous Coal Assn. v. DeBenedictis,* 480 U.S. 470, 495, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987); *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 295–96, 101 S.Ct. 2352, 2370–71, 69 L.Ed.2d 1 (1981)). Of particular relevance to this case, the court justified this *per se* rule by stating:

[R]egulations that leave the owner of land without economically beneficial or productive options for its use—*typically, as here, by requiring land to be left substantially in its natural state*—carry with them a heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm.

*Lucas,* 505 U.S. at —— ——, 112 S.Ct. at 2894–95 (citations omitted) (emphasis added).

When a total regulatory taking occurs the government can resist compensation only if the nature of the owner's estate shows that the proscribed use was not part of the owner's property right to begin with. *Lucas,* 505 U.S. at ——, 112 S.Ct. at 2899. In the case of a fee simple estate in land the government has the burden of proof to demonstrate that the prohibited use of the property constitutes a nuisance under state common-law doctrine. It cannot hide behind conclusory legislative findings that simply characterize land use restrictions as harm-preventing. *See* Jan G. Laitos, *The Takings Clause in America's Industrial States After* Lucas, 24 U.Tol.L.Rev. 281, 309 (1993) (citing *Lucas,* 505 U.S. at ——, 112 S.Ct. at 2901).[11] In this

---

11. This exception is quite narrow as noted by Justice Kennedy in his opinion concurring in judgment:

Where a taking is alleged from regulations which deprive the property of all value, the test must be whether the deprivation is contrary to reasonable, investment-backed expectations.... The common law of nuisance is too narrow a confine for the exercise of regulatory

power in a complex and interdependent society.... I do not believe ... [nuisance law] ... can be the sole source of state authority to impose severe restrictions.

*Lucas,* 505 U.S. at ——, 112 S.Ct. at 2903 (Kennedy, J., concurring in judgment). The majority opinion in *Lucas* does not require an analysis of "reasonable investment-backed expectations" when a total regulatory taking has occurred.

case the so-called nuisance exception has little relevance. All Mr. Bowles wanted to do was the same exact use as his surrounding neighbors; build a home in a residential subdivision.

At trial the parties focused on whether Bowles' had "reasonable investment-backed expectations" to build on Lot 29 even though in the later light of *Lucas'* categorical rule this may have been unnecessary. Stated differently, the evidence at trial focused on whether Bowles' was "on notice" that Lot 29 was subject to Corps jurisdiction. *See, e.g., Deltona Corp. v. United States,* 657 F.2d 1184, 1191, 228 Ct.Cl. 476 (1981). While the facts of this case establish a total regulatory taking under *Lucas,* it also appears clear that plaintiff had no notice of the Corps' jurisdiction within the subdivision and that a reasonable investor would likewise have had no notice. Thus, Mr. Bowles' investment-backed expectations were reasonable and the facts of this case require just compensation under either analysis.

## II. Bowles' Property.

### *A. Total Deprivation Under* Lucas.

■ According to *Lucas,* if government regulation of land eliminates *all* economically viable use the government can only avoid compensation if the proscribed use constitutes a nuisance under state law. *Lucas,* 505 U.S. at ——, 112 S.Ct. at 2899. Moreover, "any limitation so severe cannot be newly legislated or decreed (without compensation) but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Lucas,* 505 U.S. at ——, 112 S.Ct. at 2900. A regulation "with such an effect must, in other words, do no more than duplicate the result that could have been achieved in the courts—by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally." *Id.*

However, even in the view of Justice Kennedy's concurrence the intended use by Mr. Bowles is far from the line that a state may prohibit without compensation for a total deprivation. It

In order to determine the economic impact of the regulation and whether any economically viable use remains the court must compare the fair market value of the property before the alleged taking with the fair market value of the property after the alleged taking. *See, e.g., Florida Rock Industries, Inc. v. United States,* 791 F.2d 893, 905 (Fed.Cir.1986); *Formanek v. United States,* 26 Cl.Ct. 332, 335–40 (1992); *Florida Rock Industries, Inc. v. United States,* 21 Cl.Ct. 161, 169–71 (1990), *vacated and remanded on other grounds,* 18 F.3d 1560 (Fed.Cir.1994); *Loveladies Harbor, Inc. v. United States,* 21 Cl.Ct. 153, 156–59 (1990).

The only evidence presented at trial as to the value of Lot 29 before the government action is the plaintiff's appraisal. The parties do not dispute that the only economically viable use of Lot 29 is for the construction of a single family residence. Plaintiff's appraiser utilized the sales comparison approach to determine fair market value and concluded that prior to the alleged taking Lot 29 had a fair market value of $70,000.00.

Fair market value is defined as follows:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated.

2. both parties are well informed or well advised, and each acting in what he considers his own best interest.

3. a reasonable time is allowed for exposure in the open market.

4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

should also be noted that while Justice Kennedy's comments focus on "state authority" the scope of federal "police power" is more limited.

5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Plaintiffs Exhibit 26, p. 8; *see also Florida Rock Industries, Inc. v. United States,* 791 F.2d 893, 903 (Fed.Cir.1986); *Florida Rock Industries, Inc. v. United States,* 21 Cl.Ct. 161, 169–71 (1990), *vacated and remanded on other grounds,* 18 F.3d 1560 (Fed.Cir.1994); *Loveladies Harbor, Inc. v. United States,* 21 Cl.Ct. 153, 156–59 (1990).

Plaintiff's sales comparison approach was based on two relatively contemporaneous sales of lots within section II of Treasure Island that have desirable frontage on Cold Pass similar to Lot 29. Both lots were similar in size to Lot 29, and were sold "as is" vacant and without bulkheading. Defendant attacks plaintiff's appraisal on the basis that it lacks "wetland" comparables. The government argues that the land taken must be valued subject to all existing legal restrictions. However, this begs the very question of whether the government's regulation diminished the value of Lot 29. The Federal Circuit made the following curt response to the same argument in *Florida Rock:*

> We suppose ... [the government] ... added this contention to provide a little humor for an otherwise serious and scholarly brief, and say no more about it.

*Florida Rock,* 791 F.2d at 905. Similarly, this court will say no more about it.

The first sale was the northwestern most lot in section II of Treasure Island located on Anchor Drive. This sale was dated October 21, 1983, approximately one year prior to the alleged taking, and involved a sale price of $50,000.00. The purchaser put $10,000.00 down and financed the remainder. The second sale was the southwestern most lot on Schooner Drive, one street north of China Clipper Drive. This lot was also sold "as is" vacant and without bulkheading. This sale was dated April 11, 1985, approximately six months after the date of the alleged taking, and was a cash sale for $70,000.00. No adjustments were made as to either sale due to the similarities between both comparables and the subject Lot 29.

The appraiser concluded that the second sale was more accurate. It was closer in time to the alleged taking and indicated the increasing scarcity of lots with the more desirable frontage directly on Cold Pass. Lastly, the appraisal states that if typical financing were available for Lot 29, a prospective purchaser would be willing to pay as much as $75,000.00. Although the range of value was between $50,000.00 and $75,000.00, plaintiff's appraiser arrived at a fair market value of $70,000.00 which he believed accounted for the fact that Bowles did not own the narrow strip of land directly on Cold Pass (Lot 28).

Despite the conclusion reached by plaintiff's appraiser he also recognized that "there is no scientific method of determining the subject's value ... [and that] ... [i]t would be convenient and even prudent, perhaps, to select the middle of the range ..." Plaintiff's Exhibit 26, p. 25. Accordingly, the court believes a fair estimate of value for Lot 29 before the government action is $60,-000.00. However, this figure must be discounted by the fact that Bowles would have had to acquire Lot 28 in order to insure direct access to Cold Pass. Bowles testified that in the early 1980s he had discussions with the owner of Lot 28 and had agreed to a purchase price of $5,000.00, but the sale was never consummated because he did not want to "waste" $5,000.00 if he could not build on Lot 29. Therefore, after considering all the evidence the court concludes that the fair market value of Lot 29 before the government action was $55,000.00.

Both plaintiff's and defendant's appraisers expressed opinions as to the value of Lot 29 after the government action. Initially, the court notes that plaintiff's burden is to produce sufficient evidence of the absence of real value to shift the burden of production to defendant. *Florida Rock,* 21 Cl.Ct. at 170, *vacated and remanded on other grounds,* 18 F.3d 1560 (Fed.Cir.1994); *Loveladies Harbor, Inc.,* 21 Cl.Ct. at 157–58. It would be patently unreasonable, and logically impossible, to require plaintiff to prove a negative—that Lot 29 has no value. In this case the court finds that plaintiff has produced sufficient evidence to establish a

*prima facie* case and shift the burden of production to defendant.

There is no dispute that the only economically viable use of Lot 29 is for the construction of a single family residence. Plaintiff's expert real estate appraiser, after considering all the facts and circumstances surrounding Lot 29, concluded that constructing a residence was not economically feasible without fill, and that Lot 29 actually became a liability after the government action because Bowles would still be liable for annual property tax assessments. Without a water hook-up, and an economically feasible sewage disposal system, a residence on Lot 29 could be nothing more than a place to set up a tent, if this was permitted. In order to receive a water hook-up Bowles must get TIMUD approval of a sewage disposal system. The septic system Bowles proposed, and which was the only realistic system presented at trial, required filling the entire lot, which the Corps prohibited. Therefore, the government's case focused on presenting an alternative sewage disposal system that did not require fill.

■ Under the alternative proposed by the government, its appraiser concluded that Lot 29 has a residual value of $4,500.00. The government's alternative assumes Bowles could install a holding tank sewage disposal system on Lot 29, and that he could do so without filling the entire lot.[12] In essence, the government proposed that a residence could be constructed on stilts without disturbing the natural topography of the wetland.

However, a holding tank sewage disposal system, unlike the under ground septic system proposed by Bowles, needs to be emptied regularly.[13] Of course, the frequency of this maintenance depends on the amount of use. It was undisputed at trial that no other residence in the area uses a holding tank. In fact, all the experts testified that they had never seen a holding tank used by a private residence on a permanent basis. Holding tanks are primarily used by campgrounds, RV parks, and on a temporary basis by businesses that expect eventually to be connected to a central sewer system. In a residential area that is not connected to a central sewer system, such as Treasure Island, holding tanks are simply not used. The evidence clearly showed that the government's alternative is only a theoretical attempt to show that Lot 29 has some remaining value.

The government's estimate of remaining value is $4,500.00; the value of Lot 29 after the government action ($17,500.00) less the cost of maintaining a holding tank on the property over a period of 25 years discounted to present value ($13,500.00). Therefore, even under the government's theoretical alternative the value of Lot 29 is diminished by 91.8%. More importantly, the government's estimates of usage and cost are highly suspect. The government assumed a usage of only 16,000 gallons annually, and a $.07 per gallon disposal cost. However, plaintiff presented credible and persuasive expert testimony, from an engineer that designs sewage disposal systems, that usage as high as 15,000 gallons *per month* is common, and that disposal costs average *$.15* per gallon. In the court's view the plaintiff's estimates are more credible, but even a median estimate of

---

12. The government's assumption is questionable in two regards. First, as the court previously noted the evidence indicated that TIMUD would not approve a holding tank sewage disposal system. *See supra* note 7. Second, even if the government's alternative were approved it seems that Bowles would still need fill to satisfy the Architectural Commission. *See supra* note 9. However, because the court finds the government's alternative financially infeasible, the court need not consider these additionally troubling issues.

13. A septic system, as opposed to a holding tank, is relatively maintenance free once installed. A septic system usually consists of a series of underground concrete tanks that clarify solid sewage into liquid septic effluent that can be safely discharged into the field above the tanks. Essentially, each tank is a filtering system containing anaerobic bacteria to disintegrate suspended solid waste. Once the clarification process is complete the septic effluent is uniformly discharged through a system of perforated pipes into surrounding septic rock which is covered by a layer of topsoil.

On the other hand, a holding tank is self-explanatory. When the tank is full the sewage must be pumped out of the tank and into a truck by a sewage disposal company.

usage and cost would result in Lot 29 having a substantial negative value.

After considering all the evidence the court can conclude only that the government's alternative lacks any credibility. In the court's view "a solid and adequate fair market value" for Lot 29 does not exist, nor does the court believe Bowles can recoup his investment. *Florida Rock Industries, Inc. v. United States*, 791 F.2d at 903, 905 (Fed.Cir.1986). Lot 29 has no remaining economically beneficial use after the government action. *Lucas*, 505 U.S. at ——, 112 S.Ct. at 2895. Therefore, pursuant to the "total takings" rule announced in *Lucas*, Bowles has suffered a taking and must be compensated unless building a house on Lot 29 constitutes a common law nuisance under Texas law—a position the government has not taken.

In its brief, the government also argues that the diminution in value of Lot 29 was somehow "caused" by non-federal action. That is, either the state of Texas or the deed restrictions are to blame. However, as the court noted at closing argument, this is like saying that if the federal government drops a fire bomb on a wood house the federal government did not destroy it because the fact of having a wooden rather than a concrete house is why it burned down. The burden of plaintiff is to show that "but for" the federal government's action they would have been able to realize their plans for the property allegedly taken. The evidence here satisfies any reasonable "but for" causation test. But for the denial of a fill permit no state or local authority would have prohibited Bowles from building on Lot 29. The government's argument turns "but for" causation on its head.

The federal government cannot avoid its constitutional responsibilities because Bowles and his neighbors have made mutually beneficial restrictive covenants regarding the use of their land. Spontaneous private ordering of property rights is widespread in a free society and generally exists prior to federal government land-use regulations. In this case it is *only* because of the federal government's refusal to issue a fill permit that Lot 29 has no fair market value or economically viable use.

**B. Less Than Total Deprivation—Pre-Lucas Analysis.**

**i. Bowles' Expectations.**

Even assuming *arguendo* the alleged taking in this case is less than total, the court still concludes Bowles has suffered a compensable taking under pre-*Lucas* regulatory takings doctrine. Under the pre-*Lucas* framework the relevant inquiry here would involve considering the economic impact of the regulation on Lot 29 *and* whether Bowles' investment-backed expectations were reasonable at the time he acquired Lot 29.[14]

14. The court notes that the "character of the government action" is an additional guideline that is sometimes used in determining when a regulation goes too far. *Loveladies Harbor, Inc. v. United States*, 15 Cl.Ct. 381, 391 (1988); *Florida Rock*, 21 Cl.Ct. at 168–69, *vacated and remanded on other grounds*, 18 F.3d 1560 (Fed.Cir. 1994) (citing *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224–25, 106 S.Ct. 1018, 1025–26, 89 L.Ed.2d 166 (1986)). Typically, an inquiry into the character of the government action addresses whether the interference with property involves physical invasion or interference by regulation; interference of the former type has been more likely to be considered a taking than the latter. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 488–89 n. 18, 107 S.Ct. 1232, 1243–44, n. 18, 94 L.Ed.2d 472 (1987). Here there is no dispute that the interference is by regulation rather than physical invasion. Some sense can also be derived from the case law that where government acts as an umpire to balance private or public harm against the regulatory restrictions imposed on the plaintiff a taking is less likely than if the government is attempting to achieve a general public goal at the expense of a particular property owner. *Compare Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928); *Village of Euclid, Ohio, et al. v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Belk v. United States*, 12 Cl.Ct. 732 (1987), *aff'd*, 858 F.2d 706 (Fed.Cir.1988), *with*, *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *Lucas v. South Carolina Coastal Council*, 505 U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Whitney Benefits, Inc. v. United States*, 926 F.2d 1169 (Fed.Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 406, 116 L.Ed.2d 354; *United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed.Cir.1990). The doctrinal lines in this body of law stretching back over a century are anything but crystal clear, however, where the government seeks to adjust the mutual burdens and benefits of society a taking is less likely than when government creates a general public benefit by burdening discrete private individuals.

The court has previously discussed the economic impact of the government's action and it is undisputed that even under the government's best case scenario there is a 91.8% diminution in value. The court believes this is a sufficiently severe economic impact to warrant compensation. Accordingly, in this case the court's analysis under pre-*Lucas* doctrine focuses on whether Bowles' investment-backed expectations were reasonable at the time he acquired Lot 29.

Bowles investment-backed expectations were to build a permanent retirement residence on Lot 29. This use is consistent with other uses within the Treasure Island subdivision. There is no dispute that the only economically viable use of Lot 29 is for the construction of a single family residence. There is overwhelming evidence that Bowles would have met all of the state's conditions to build, and satisfied all of his deed restrictions, if the Corps had issued a fill permit. There is also no question that the proposed use was financially and physically feasible if the Corps had issued a fill permit. In this respect the court concludes Bowles' expectations were reasonable.

### ii. Notice.

#### a. General Principles.

In *Deltona Corp. v. United States,* 657 F.2d 1184, 1191, 228 Ct.Cl. 476 (1981), the Court of Claims denied a wetlands taking claim based in part on the plaintiff's prior "notice" of the Corps' jurisdiction. The court in *Deltona* explained the "notice" defense as follows:

Moreover, when Deltona acquired the property in 1964, it knew that the development it contemplated could take place only if it obtained the necessary permits from the Corps of Engineers. Although at that time Deltona had every reason to believe that those permits would be forthcoming when it subsequently sought them, it also must have been aware that the standards and conditions governing the issuance of permits could change. Deltona had no assurance that the permits would issue, but only an expectation. Indeed, five years after Deltona acquired the property, it was given notice that its expectancy might never come to fruition when it was told, in connection with the issuance of the permit for Roberts Bay, that 'the granting of this permit does not necessarily mean that future applications for permit or permits in the general area of the proposed work by Marco Island Development Corporation or others will be similarly granted.'

*Deltona,* 657 F.2d 1184, 1193, 228 Ct.Cl. 476 (1981).

■ Recently, the United States Claims Court applied the "notice" defense as an independent basis to deny a wetlands takings claim in *Ciampitti v. United States,* 22 Cl.Ct. 310 (1991). In *Ciampitti,* Judge Bruggink denied Ciampitti's taking claim in part because "he had more than ample warning prior to purchase that the property was encumbered by a likelihood it could not be developed." *Ciampitti,* 22 Cl.Ct. at 321.[15]

---

**15.** However, in *Nollan v. California Coastal Comm'n,* Justice Scalia speaking for a majority of the Supreme Court addressed the issue of prior "notice" of government action:

[The dissent] ... also suggest that the Commission's public announcement of its intention to condition the rebuilding of houses on the transfer of easements of access caused the Nollans to have "no reasonable claim to any expectation of being able to exclude members of the public from walking across their beach.... [The dissent] ... cites our opinion in *Ruckelshaus v. Monsanto Co.* [467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)] ... as support for the peculiar proposition that a unilateral claim of entitlement by the government can alter property rights. In *Monsanto,* however, we found merely that the Takings Clause was not violated by giving effect to the Government's announcement that application for "the

right to [the] valuable Government benefit," ... of obtaining registration of an insecticide would confer upon the Government a license to use and disclose the trade secrets contained in the application.... *But the right to build on one's own property—even though its exercise can be subjected to legitimate permitting requirements—cannot remotely be described as a "governmental benefit."* And thus the announcement that the application for (or granting of) the permit will entail the yielding of a property interest cannot be regarded as establishing the voluntary "exchange," ... that we found to have occurred in *Monsanto. Nor are the Nollans' rights altered because they acquired the land well after the Commission had begun to implement its policy. So long as the Commission could not have deprived the prior owners of the easement without compensating them, the prior owners. must be understood to have

When the land owner has actual knowledge of the government regulation prior to purchase, the "notice" defense makes economic sense. A rational buyer who has actual notice of government land-use regulations prior to purchase will consider the risk that use may be restricted when deciding how much to pay. That is, the rational buyer is compensated for this risk up front by purchasing the property at a discount. Though, of course, the seller may have a valid taking claim.

### b. Did Bowles Have Notice?

██ There is no doubt Bowles subjectively believed in 1980 that he could build a house on Lot 29 without a permit from the Corps. However, the question before the court is whether this belief was objectively reasonable. That is, would the hypothetical reasonable purchaser or investor, upon whom legal tests are based, in 1980 conclude that Lot 29 could be built upon without a permit from the Corps? To answer this question the court must look to the circumstances that would confront such a reasonable person. After considering all the evidence in this case the court can only conclude that a reasonable person would have believed in 1980, as did Bowles, that Lot 29 could be built upon without a permit from the Corps.

Here, Mr. Bowles, or someone similarly situated, would not have had notice of Corps jurisdiction over Lot 29. In fact, the Corps apparently did not have jurisdiction over a substantial part of the subdivision for several reasons. *See Bowles v. United States Army Corps of Engineers,* 841 F.2d 112, 116 n. 21 (5th Cir.1988).[16] The government suggests that Bowles should be held to a higher standard because of his involvement with GCWCA and TIMUD where he gained gen-

eral knowledge and awareness of the Corps jurisdiction. According to the government, Bowles should be presumed to have been "on notice" as to the Corps jurisdiction over Lot 29. The court disagrees.

Bowles undisputed testimony was that his involvement with the Corps as a member of TIMUD and GCWCA reinforced his belief that the Corps did not have jurisdiction over Lot 29 because he had never seen nor heard of any Treasure Island resident ever applying to the Corps for a fill permit. Moreover, the court visited the property and saw nothing that could reasonably constitute a "red flag" that would justify imputing Bowles with "notice" of the Corps jurisdiction over Lot 29. If anything, the opposite was apparent. There are several constructed homes on the north side of China Clipper Drive on lots virtually identical to Lot 29. Bowles' uncontroverted testimony was that he knew several of these homeowners and not a one had ever applied to the Corps for a fill permit. There was also testimony that even after the time of Bowles' permit denial other lots within the subdivision were filled in the exact manner Bowles wanted to fill his.

### iii. Nuisance Exception.

██ In this case the government has not argued that Bowles' proposed use of Lot 29 (building a residence) constitutes a nuisance under Texas law. Accordingly, it is unnecessary for the court to extensively address the nuisance issue as in prior cases. *See Florida Rock Industries, Inc. v. United States,* 21 Cl.Ct. 161, 167 (1990), *vacated and remanded on other grounds,* 18 F.3d 1560 (Fed.Cir. 1994) (this court found rock mining did not constitute a nuisance); *Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. 381, 389 (1988) (this court found development of resi-

---

*transferred their full property rights in conveying the lot.*
*Nollan v. California Coastal Comm'n,* 483 U.S. 825, 833–34 n. 2, 107 S.Ct. 3141, 3147 n. 2, 97 L.Ed.2d 677 (emphasis added). In *Nollan,* the Court limits the applicability of the "notice" defense to situations that involve a "voluntary exchange" between the government and private entities. Moreover, from the above discussion one could argue that prior "notice" has no relevance in cases involving land use regulation. In any event, the Court has recently agreed to hear a case implicating its opinion in *Nollan,* and the

Court may soon clarify this area of the law. *Dolan v. City of Tigard,* 317 Or. 110, 854 P.2d 437 (1993), *cert. granted,* ─── U.S. ───, 114 S.Ct. 544, 126 L.Ed.2d 446 (1993).

16. "Other development was permitted either (i) because it was a water dependent project, such as a marina; (ii) pursuant to a mitigation plan filed with the Corps; or (iii) pursuant to a nationwide permit or under grandfather regulations." *Bowles,* 841 F.2d at 116.

dential lots did not constitute a nuisance). Moreover, in a case decided prior to *Lucas* that involved the same South Carolina law, Judge Hall of the Fourth Circuit commented on the argument that building a residence on beachfront property constituted a noxious use tantamount to a public nuisance:

> Living in a beach bungalow bears little resemblance to the noxious uses of property the Supreme Court has identified. *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887) (distillery); *Reinman v. Little Rock,* 237 U.S. 171, 35 S.Ct. 511, 59 L.Ed. 900 (1915) (downtown livery stable); *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (urban brickyard); *Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (red cedar trees infected with apple rust disease near commercial orchards); and *Goldblatt v. Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962) (quarrying below water table near town that depended on groundwater supply). *The rapidity with which rental beach houses are gobbled up by the public causes me to doubt that they are, at least yet, generally regarded as 'tantamount to a public nuisance.'*

*Esposito v. South Carolina Coastal Council,* 939 F.2d 165, 173 n. 2 (4th Cir.1991) (Hall, J., dissenting) (emphasis added).

The court reaffirms the conclusion it reached in *Loveladies Harbor* that the development of a residential lot does not constitute a nuisance.

### III.  Just Compensation.

Based on the court's previous discussion it concludes that the denial of plaintiff's permit application effected a taking of Lot 29 as of October 26, 1984. The court concludes that the value of Lot 29 prior to the taking was $55,000.00. Accordingly, to fulfill the mandate of the fifth amendment's just compensation clause, the court awards plaintiff the amount of $55,000.00 plus interest compounded annually from the date of taking. *Whitney Benefits, Inc. v. United States,* 30 Fed. Cl. 411, (1994) (compound interest awarded for significant delay).

While compound interest ordinarily does not run against the government without its consent, this prohibition on interest against the government does not apply in fifth amendment takings cases. *Id.* at 414–15. Simple interest cannot put the property owner in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation, because it undervalues the worth of the property. *Id.* The economic reality is simply that if the full value of just compensation had been put in escrow contemporaneously with the alleged taking, the landowner would have been able to earn compound interest. *Id.* at 415. Thus, prohibiting the landowner from recovering compound interest acts to retroactively reduce the value of just compensation at the time of taking by undervaluing its present worth. *Id.* Accordingly, the court holds that, because of the long delay since the date of taking in this case, the award of compound interest is not only proper, but its denial would effectively undercut the protections of the fifth amendment to our Constitution. *Id.* (citing *Florida Rock Industries, Inc. v. United States,* 23 Cl.Ct. 653, 658 (1991), *vacated and remanded on other grounds,* 18 F.3d 1560 (Fed.Cir.1994) (delay of approximately a decade justifies award of compound interest)).

However, because *Whitney Benefits* involved commercial property this court did not have to address the issue of whether an award of compound interest would be appropriate in takings cases where the property was not held for commercial use. *Whitney Benefits, Inc. v. United States,* 30 Fed.Cl. 411, 415 n. 3 (1994) ("The court expresses no opinion on this proposition, as it is not at issue in this case."). In *ITT Corp. v. United States,* 17 Cl.Ct. 199, 240 (1989), Judge Nettesheim awarded compound interest in a patent taking case but raised a question about this issue:

> The reasons to compound interest to achieve the measure of delay compensation in this case are not unique to plaintiff, but are to patent suits against the Government. *Eminent domain cases involving takings of land may or may not evolve from takings of land applied in commerce.* A patent holder, in contrast, has been giv-

en a limited license to monopolize his invention, and the Government's unauthorized use of a patented item frustrates the economic expectations generated by the patent. The taking in an infringement action always impacts on a established or potential commercial exploitation of a patent if the patent holder either has commercialized the patent or is in the business of commercializing a similar product or process as that called for by the patent. *This may not be true in takings of land.* ITT *Corp.,* 17 Cl.Ct. at 240 (emphasis added).

The court here cannot find any principled reason for awarding compound interest only in cases where the plaintiff intended a commercial use for the property taken. Such a rule would lead to odd results. For example, if Bowles intended to use his home on Lot 29 as rental property he would be entitled to compound interest, whereas, if he actually intended to live there he would not. Such a rule ignores the economic reality that for many middle class Americans the homestead is their primary economic investment. Moreover, a free market based on consumer sovereignty does not discriminate between profit seekers and consumers. In sum, fundamental fairness in awarding just compensation requires equal treatment between those holding property for value and those holding property for use.

### Conclusion

Although the takings clause is not designed to limit governmental interference with property rights *per se,* it does mandate compensation when otherwise socially desirable interferences amount to a taking. *See First English Evangelical Lutheran Church v. Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). The basic question is upon whom the loss of socially desirable regulations should fall. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 416, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). A determination that governmental action constitutes a taking, is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest. *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141,

65 L.Ed.2d 106 (1980); *Florida Rock v. United States,* 18 F.3d 1560, 1570–71 (Fed.Cir. 1994) (The proper question is "[H]as the Government acted in a responsible way, limiting the constraints on property ownership to those necessary to achieve the public purpose, and not allocating to some number of individuals, less than all, a burden that should be borne by all?").

When, as in this case, a single owner of real property has been called upon to sacrifice *all* economically beneficial use of his land, in this case his future homestead, in the name of the common good he has suffered a taking. *Lucas v. South Carolina Coastal Council,* 505 U.S. at ——, 112 S.Ct. at 2895. However, even assuming *arguendo* Bowles' sacrifice here is less than total, the court finds his reasonable investment-backed expectations have been substantially frustrated so that compensation is required under the fifth amendment.

The court awards the plaintiff just compensation of $55,000.00 plus interest compounded annually from the date of taking, October 26, 1984. The parties shall within sixty days prepare a stipulation as to the amount of interest, attorneys fees, and costs due. Plaintiff will tender the deed to Lot 29 upon the satisfaction of the judgment. The entry of judgment will be stayed pending the determination of attorneys fees and costs to which plaintiff is entitled pursuant to 42 U.S.C. § 4654 (1988).

IT IS SO ORDERED.