**STORE SAFE REDLANDS ASSOCIATES,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 93–85L.

United States Court of Federal Claims.

June 11, 1996.

Harold L. Hensley, Jr., Roswell, New Mexico, for plaintiff. James M. Hudson, Midland Texas, and John E. Marvel, Elko, Nevada, were of counsel.

Dorothy R. Burakreis, General Litigation Section, Environment and Natural Resources Division, U.S. Department of Justice, Washington D.C., for defendant. Jeffrey Eisenberg, Office of the General Counsel, U.S. Department of Agriculture, and Ann D. Navaro, Washington, D.C., were of counsel.

## OPINION

SMITH, Chief Judge.

Plaintiff, Store Safe Redlands Associates, Ltd. (Store Safe), has alleged a government taking of its property in three claims: (1) a physical or regulatory taking of vested range stock water rights; (2) a temporary taking of vested irrigation water rights of the North and South Twin Rivers; and (3) a taking of vested and decreed irrigation water rights of the Wisconsin, Summit, Last Chance, and Ophir Creeks (Four Canyons). Currently, this case is before the court on the plaintiff's motion for partial summary judgment and the defendant's cross motion for summary judgment.

The court must deny both motions. The court finds that a limited evidentiary hearing is necessary to address the mixed questions of law and fact regarding the existence of the property interests claimed by plaintiff in the water rights and ditch rights-of-way.

## INTRODUCTION

Plaintiff claims that defendant has taken its property rights in water and in ditch rights-of-way which date from the nineteenth century. It is the court's duty to determine whether plaintiff holds the property rights claimed, to determine the scope of those rights, and to determine whether governmental action has deprived Store Safe of property rights protected under the Fifth Amendment.

As this court explained in *Hage v. United States,* 35 Fed.Cl. 147 (1996), a court has no part in determining public policy. A constitutional claim, such as the violation of the Fifth Amendment plaintiff alleges here, must be determined by applying the tools and skills of legal analysis and logic in the light of precedent. This is the only way the rule of law can be maintained in a constitutional system. In *Hage,* the court illustrated that although taking law can justly be called murky, a somewhat coherent framework has begun to crystallize. *Id.*

■ Based upon Supreme Court and Federal Circuit cases,[1] two distinct categories of takings have emerged from the conceptual broth: physical and regulatory. A physical taking occurs when the government actually seizes or does the equivalent of seizing the property. Although this category has been a mainstay of precedent, there has rarely been a pure physical taking. This is so because our government and its agents rarely seize or occupy property without some arguable legal or regulatory authority. In reading the "physical" taking cases the dominant characteristic is not the absence of legal or regulatory authority but the fact that government appropriated the property to use, albeit for some public purpose.

Thus, in the typical flooding case the government puts its water on the private citizen's land. In *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), the government used the citizen's air space for its planes. Similarly, in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), the government used a small area of the citizen's building, and in *Hendler v. United States,* 952 F.2d 1364 (Fed.Cir.1991), the government used the citizen's land for its test wells.[2]

---

1. *See e.g., Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (regulatory taking); *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) (physical taking); *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (physical taking); *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (regulatory taking); *Lucas v. South Carolina*

*Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (regulatory taking).

2. *See also Dolan v. City of Tigard,* —— U.S. ——, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). In *Dolan,* the government wanted to use part of Mrs. Dolan's land for a public bikeway. However, the case also shares some attributes of a regulatory taking in that the government was

By contrast the regulatory taking category involves the imposition upon the private property of some required government condition, generally limiting or prohibiting any beneficial use by the private owner. The restriction can be analogized to the government's appropriation of an easement. In cases like *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), and *Loveladies Harbor, Inc. v. United States*, 21 Cl.Ct. 153 (1990), *aff'd* 28 F.3d 1171 (Fed.Cir.1994), the easement made the property worthless to the owner; effectively prohibiting any use other than holding the deed. In other cases like *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), and *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Court found only a partial diminution from the regulation or the *de facto* easement imposed.

Regulatory taking analysis dates back at least as far as 1871 when the Supreme Court decided the *Legal Tender Cases*, 12 Wall. 457, 551, 20 L.Ed. 287 (1871). In 1922, the Court addressed regulatory takings in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Regulatory taking analysis has received much attention in the past few years.[3] Since 1922, the Supreme Court has applied a test in regulatory taking cases that is seen by many as so fact specific that general predictability is made very difficult. *See e.g. Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). In all of these cases, the Court had to determine whether a government regulation had gone "too far." This was not a very predictable test, no matter how many prongs it contained. *See Hage*, 35 Fed.Cl. at 150 (discussing the practical application of the "too far" language). With the decisions in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) and *Dolan v. City of Tigard*, —— U.S. ——, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), however, the Court has appeared to crystalize the structure of a taking analysis into a more regular lattice.

The instant case is very much like *Hage*. While it is similar in some respects to a

---

restricting Mrs. Dolan general use of her property unless she "allowed" the public bikeway.

**3.** *See, e.g.*, Michael M. Berger, *Happy Birthday, Constitution: The Supreme Court Establishes New Ground Rules for Land–Use Planning*, 20 Urb. Law. 735 (1988); Karen Budd–Falen, *The Right to Graze Livestock on the Federal Lands: The Historical Development of Western Grazing Rights*, 30 Idaho L.Rev. 505 (1993); Lynda L. Butler, *Environmental Water Rights: An Evolving Concept of Property*, 9 Va.Envtl.L.J. 323 (1990); Richard A. Epstein, *Takings: Descent and Resurrection*, 1987 Sup.Ct.Rev. 1 (1987); James L. Huffman, *Judge Plager's "Sea Change" in Regulatory Takings Law*, 6 Fordham Envtl.L.J. 597 (1995); James L. Huffman, *Lucas: A Small Step in the Right Direction*, 23 Envtl.L. 901 (1993); John A. Humbach, *Constitutional Limits on the Power to Take Private Property: Public Purpose and Public Use*, 66 Or.L.Rev. 547 (1987); Jan G. Laitos, *Causation and the Unconstitutional Conditions Doctrine: Why the City of Tigard's Exaction was a Taking*, 72 Denv.U.L.Rev. 893 (1995); Jan G. Laitos, *The Public Use Paradox and the Takings Clause*, 13 J.Energy Nat.Resources & Envtl.L. 9 (1993); Richard Lazarus, *Changing Conceptions of Property and Sovereignty in Natural Resources: Questioning the Public Trust Doctrine*, 71 Iowa L.Rev. 631 (1986); Marla Mansfield, *When "Private" Rights Meet "Public" Rights: The Problems of Labeling and Regulatory Takings*, 65 U.Colo.L.Rev. 193 (1994); Nancie G. Marzulla, *Regulatory Takings in the United States Claims Court: Adjusting the Burdens That in Fairness and Equity Ought to be Borne by Society as a Whole*, 40 Cath.U.L.Rev. 549 (1991); Joseph Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich.L.Rev. 471 (1970); James W. Sanderson & Ann Mesmer, *A Review of Regulatory Takings After Lucas*, 70 Denv.U.L.Rev. 497 (1993); Joseph Sax, *The Constitution, Property Rights and the Future of Water Law*, 61 U.Colo.L.Rev. 257 (1990); Glenn P. Sugameli, *Takings Issues in Light of Lucas v. South Carolina Coastal Council: A decision Full of Sound and Fury Signifying Nothing*, 12 Va.Envtl.L.J. 439 (1993); William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum.L.Rev. 782 (1995); Michael Allan Wolf, *Overtaking the Fifth Amendment: The Legislative Backlash Against Environmentalism*, 6 Fordham Envtl.L.J. 637 (1995); Michael Allan Wolf, *Takings Term II: New Tools for Attacking and Defending Environmental and Land–Use Regulation*, N.Ill.U.L.Rev. 469 (1993); Richard Miniter, *The Shifting Ground of Property Rights*, Insight Magazine, Aug. 23, 1993.

regulatory taking, the case is not on its facts a regulatory taking. Plaintiff and the government at this stage dispute not the government's regulatory scheme, but rather they dispute the ownership of the property right. This dispute can be, perhaps, best characterized by the category of a *legal taking*. This is analogous to a dispute between two private parties over title to a single parcel of land. As such, the dispute shares many commonalities with the so-called physical taking. It is probably not important whether this court categorizes legal takings as a subset of the physical taking category or as a separate category. What is perhaps most immediately relevant is what the parties must do to prove their contentions.

■ Generally, in a physical taking the issue is did the government create the physical effect claimed; e.g. flooding, vibrations, pollution; etc. The legal issue is then whether it had a right to do so. In the legal taking case the issue order is reversed. Does the private citizen or the government own the property at issue and next did the government action interfere with that ownership right?

■ In *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164, 101 S.Ct. 446, 452, 66 L.Ed.2d 358 (1980), the Supreme Court stated "a State by ipse dixit, may not transform private property into public property without compensation." *Id.* Hence, a legal taking occurs when the government asserts a legal claim to private property that is unsupported by our law. *See e.g., Shelden v. United States*, 7 F.3d 1022 (Fed.Cir.1993), *on remand*, 34 Fed.Cl. 355 (1995) (finding that the government's action of seizing property under the Racketeer Influenced and Corrupt Organizations Act (RICO) destroyed plaintiff's mortgage without just compensation in violation of the Fifth Amendment); *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979) (finding that the imposition of a "navigational servitude" upon property owners who were required to open a private lagoon to members of the public was a taking of private property without just compensation in violation of the Fifth Amendment).

As currently presented, the instant case, like *Hage*, its conceptual and geographic companion, fits most closely into the *legal takings* category. That is why the court has ordered as the first tier of proceedings a limited evidentiary hearing to establish whether plaintiff owns the rights in question and the scope of those rights. If plaintiff establishes ownership of its property rights under state law, the second step of the process would then go to liability, or whether government action has actually taken those rights.

## FACTS

Plaintiff, Store Safe Redlands Associates, Ltd. (Store Safe), is a general partnership consisting of Stephen C. Wilmans and Carol Wilmans. Store Safe originally was formed in 1974 as a limited partnership to build and manage mini warehouses in Redlands, California. Store Safe became a general partnership in 1986 with Stephen C. Wilmans holding 500 shares and Carol W. Wilmans holding 1500 shares. Store Safe entered the cattle business with the purchase of the Rock Springs Ranch in King City, California on October 17, 1979. After reporting tax losses and an unprofitable venture in the horse-breeding business, Store Safe acquired the RO Ranch on November 30, 1988 as a stocker operation to supplement their California ranch. A stocker operation is one that runs yearlings instead of cow/calf pairs on the range.

The partnership currently does business as RO Livestock, which is divided into four major divisions known as the RO Ranch headquarters, the San Antone, the Triple T, and the Monitor Valley ranches. These RO Livestock ranch properties are located in Nye, Lander, Esmeralda and Mineral Counties in Nevada. The RO Ranch is comprised of twenty-six base ranch properties totaling 15,000 acres of fee land which constitute the base property for grazing permits on approximately 2,000,000 acres of federal land. Store Safe is permitted to graze livestock on twelve allotments—approximately 670,000 acres—within the Tonopah and Austin Districts of the Toiyabe National Forest. The permits allow a mixture of winter and sum-

mer usage. In addition, Store Safe also grazes livestock on over 1,300,000 acres of BLM land in the Tonopah and Shoshone Eureka Resource Areas.

Store Safe applied to the Forest Service and received a ten-year grazing permit on June 30, 1989. The grazing permit was amended on May 31, 1991, to incorporate the latest Forest Management Plan, which restricted grazing to a maximum of 55 percent of the key grass species on the riparian areas within the allotment. In 1990 and 1991, the Forest Service ordered Store Safe's cattle off various allotments 3–4 weeks before the end of the scheduled grazing season based on the 55 percent standard. Store Safe allegedly elected not to utilize all of its major allotments during the 1992–94 grazing seasons because the additional regulations on its allotments made it uneconomical to graze livestock in compliance.

*CLAIMS*

Plaintiff has alleged three taking claims: (1) a physical or regulatory taking of vested range stock water rights; (2) a temporary taking of vested irrigation water rights in the North and South Twin Rivers; and, (3) a taking of vested and decreed irrigation water rights in the Four Canyons.

1.  A PHYSICAL OR REGULATORY TAKING OF VESTED RANGE STOCK WATER RIGHTS.

The initial takings claim centers on what Store Safe alleges is the taking of vested water rights; the government denies the allegations based upon the fact that the adjudication of the water rights in question is incomplete. Adjudication is the process whereby a state, such as the state of Nevada in this case, is establishing a state-wide system to monitor appropriation of water rights. The adjudication of these water rights in the state of Nevada is incomplete, ongoing and may take decades to complete. *See Hage*, 35 Fed.Cl. at 155 n. 4.

Store Safe claims vested water rights for stockwater within the Forest Service holdings dating back to the 1800s. To access these water rights, Store Safe must graze cattle on the Forest Service allotments.

Store Safe alleges that the Forest Service's policy to reclaim water rights to the land (some of the water rights are currently severed from the land) resulted in the agency using range use occupancy plans to regulate plaintiff out of its permit, which, therefore, resulted in the inability of plaintiff to utilize its water rights. Under plaintiff's theory, by limiting its grazing privileges, the Forest Service has deprived Store Safe of its vested water rights. Plaintiff also argues that the continuous issuance of grazing permits by the Forest Service has created a protected economic expectancy in Store Safe's entire ranching operation, which was taken by government action and conduct.

2.  A TEMPORARY TAKING OF VESTED IRRIGATION WATER RIGHTS IN NORTH AND SOUTH TWIN RIVERS.

Store Safe has claimed a vested easement right in the waters of North and South Twin Rivers and to irrigation ditches, constructed by previous owners, that traverses Forest Service property. Plaintiff began construction of a pipeline without Forest Service knowledge in the Spring of 1990. On March 14, 1990, the Forest Service issued plaintiff a cease and desist order. In April of 1990, Stephen Wilmans was served with a criminal complaint. Criminal charges were dropped and later in that month the Forest Service issued a special use permit authorizing the installation of the remainder of the pipeline construction.

Store Safe seeks just compensation for the government's "wrongful interference" with plaintiff's beneficial use of water rights as a result of the Forest Service's cease and desist order, as well as the request for an application for a special use permit. Plaintiff alleges this "interference" is a temporary taking of beneficial use of the Twin Rivers water rights for the 1990, 1991, and 1992 crop years.

3.  A TAKING OF VESTED IRRIGATION WATER RIGHTS IN THE FOUR CANYONS.

Store Safe claims vested irrigation rights in water and alleges 1866 Act ditch rights-of-way. 43 C.F.R. § 2801.1. The irrigation

system is located on and traverses both Forest Service and BLM land. The parties dispute whether the rights exist, and they also dispute the point of diversion.

The Forest Service has denied plaintiff access to work on irrigation mechanisms. The Forest Service has requested that Store Safe apply for a special use permit. The Forest Service's policy is to require special use permits for all uses of National Forest System lands, including pipeline construction projects. The Forest Service has denied plaintiff access without the permit. Store Safe denies the need to obtain a permit because of its easement rights based on the Act of 1866 and prior to this case had not applied for a special use permit to work on the irrigation ditches listed in this claim. Store Safe argues that the government's actions have resulted in the complete deprivation and denial of beneficial use of plaintiff's vested water rights. Therefore, plaintiff seeks compensation for the taking of "decreed irrigation waters of Wisconsin, Summit, Last Chance, and Ophir Creeks" which together make up what is known as the Four Canyons.

## DISCUSSION

### I. JURISDICTION

■ The defendant argues, as it did in *Hage*, 35 Fed.Cl. at 147, that this court does not have jurisdiction to hear plaintiff's Fifth Amendment taking claim. As the court found in *Hage*, the Tucker Act requires this court to exercise jurisdiction and the McCarran Amendment, 43 U.S.C. § 666, does not affect such jurisdiction. *See Hage*, 35 Fed. Cl. at 157–159 (discussing the court's jurisdiction in relation to water rights, state water rights adjudication proceedings, and the McCarran Amendment). Even though the court agrees with defendant that this court should not engage in general stream adjudications, this court finds that it does have the jurisdictional mandate to determine whether defendant has taken plaintiff's property. *Id.*

### II. MERITS OF MOTION AND CROSS–MOTION FOR SUMMARY JUDGMENT

Plaintiff and defendant seek summary judgment, pursuant to Rule 56(c) of the Unit-ed States Court of Federal Claims. Under Rule 56(c), summary judgment is to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Plaintiff has filed its partial summary judgment motion on defenses raised in the defendant's answer. In light of this somewhat unusual posture, the court will address the issues by initially addressing defendant's motion for summary judgment and then interweaving plaintiff's arguments. Defendant argues that it is entitled to judgment as a matter of law on the following issues: (1) Plaintiff cannot establish exclusive ownership of all stockwater in the national forest within its grazing allotments. (2) Even if plaintiff could prove the claimed vested water rights, plaintiff still lacks the compensable expectancy that they claim the government took. (3) Even if plaintiff could prove vested water rights in the irrigation waters in Twin Rivers and Four Canyons, plaintiff fails to allege facts that state a taking claim.

Plaintiff argues that it is entitled to partial summary judgment on the following defenses in the answer: (1) that this court lacks jurisdiction to determine plaintiff's taking claim; (2) that the United States Forest Service has a valid reserved or vested water right in conflict with plaintiff's right; (3) that plaintiff does not have vested rights to appropriate 14,650.38 acre feet of water per year from Twin Rivers or 2,640 acre feet per year from Four Canyons; (4) that plaintiff cannot maintain a taking claim based on plaintiff's stockwater rights; and (5) that plaintiff's taking claim fails because plaintiff did not obtain a special use permit.

### A. Stockwater Rights

Defendant presents various arguments to support its motion for summary judgment. The premise of defendant's arguments is similar to the arguments made by the defendant in the *Hage* case; however, in this case the arguments are made in defendant's tak-

ing analysis rather than in defendant's jurisdiction argument as in *Hage*. Defendant's arguments fall into two similar themes: 1) that plaintiff's taking claim fails the " 'logically antecedent inquiry'—a determination of the validity and contours of the property expectancy which plaintiff claims was taken," and 2) that plaintiff did not have a compensable expectancy in the property.

In contrast, plaintiff argues that its vested property rights are protected property interests not contingent upon a state's general stream adjudication. Plaintiff further argues in its complaint that issuance of grazing permits by the Forest Service continuously since 1907 has created a protected economic expectancy in Store Safe's entire ranching enterprise.

After reading the briefs, the court finds that neither party has addressed the initial issue before the court—who owns the property rights in question and what is the scope of those rights. Precedent dictates that the court's threshold inquiry of whether plaintiff has a property interest is not defined by what defendant has termed the "logical antecedent inquiry" or what plaintiff has characterized as "reasonable investment backed expectations."

### 1. *"Logical Antecedent Inquiry"*

As an initial component to support its "logically antecedent inquiry" argument, defendant argues that plaintiff does not own all of the stockwaters on the National Forest within the areas in which plaintiff is permitted to graze cattle, and, absent a state adjudication, plaintiff cannot establish the validity of its claim to vested stockwater rights. Therefore, without being able to establish the validity of its claims, plaintiff has no expectancy in the property it claims has been taken. Defendant cites *Lucas* to support this argument. In that case the Supreme Court stated:

Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the *logically antecedent inquiry* into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with.

505 U.S. at 1027, 112 S.Ct. at 2899 (emphasis added). Defendant seems to be trying to convert this statement from *Lucas* into a threshold test that defines whether or not a property right exists. Clearly, the Court was confining the State's ability to resist compensation to those instances when the proscribed use was not part of the original title. It was not developing a new test for property rights. These come from state law and its common law antecedents. *Lucas*, 505 U.S. at 1030, 112 S.Ct. at 2901, 120 L.Ed.2d 798.

Applying state law, both parties cited the Nevada Supreme Court case of *Ormsby County v. Kearney*, 37 Nev. 314, 142 P. 803 (1914), but for different propositions. Defendant stated, "plaintiff's claimed rights are but an empty shell until the validity and attributes of such rights are defined in the adjudication process under Nevada Water Law." Def.'s Reply at 6. Under such logic, the government would seemingly be able to use plaintiff's property throughout the decades it may take to complete the adjudication. The court finds this idea unfair and clearly in opposition to the Fifth Amendment's mandate to this court.

Plaintiff states that the *Ormsby* case indicates that the adjudication process is to determine relative rights "for administrative purposes" and is not necessary to demonstrate a protected property interest. Furthermore, plaintiff argues that in the case of *Fulton v. United States*, 825 F.Supp. 261, 263 (D.Nev.1993), the United States District Court for Nevada rejected the United States' contention that an owner of a water right under Nevada law had no protected property interest until a court decreed an adjudication.

As this court discussed in *Hage:*

[the adjudication process] does not determine who has title to the water rights at issue but defines the parameters of property interests in relation to other water rights. Using the analogy of land, the adjudication process determines the boundaries of the lot. The adjudication process does not determine whether the lot exists, as defendant ... argue[s].

35 Fed.Cl. at 163. The court finds that based upon precedent, plaintiff could have

vested water rights as so claimed and the court will hold a limited hearing to determine whether plaintiff does indeed own the claimed water rights. *See Hage,* 35 Fed.Cl. at 171–173 (discussing water rights).

Courts have not addressed the *scope* of the water rights acquired before the creation of the Toiyabe National Forest. *Id.* In this case, as in *Hage,* the court finds that plaintiff deserves the opportunity at trial to prove that the scope of its water right includes the right to access the water. Furthermore, if plaintiff is correct in its claim that the government is regulating with the intention to succeed to title of the property rights in question, it seems that the court has an increased duty to allow plaintiff its day in court.

■ While it is true that a grazing permit is not a property right, it does not follow that plaintiff had no property interest in a water right, as defendant argues. *Id.* (discussing grazing permits and water rights). Part of plaintiff's claim is based on the taking of stockwater rights which exist regardless of the grazing permit. An analysis on the legal characteristics of the grazing permit, however, may be pertinent to determine the scope and value of the stockwater rights claimed to have been taken.

■ Plaintiff also confuses fundamental concepts of taking law when it claims that the regulation of its grazing permits took the reasonable investment backed expectations of its entire ranching operation. This argument misapplies fundamental concepts of taking law. The initial inquiry by the court— whether plaintiff has a property interest—is not determined by examining whether plaintiff has "reasonable investment backed expectations." Such an inquiry is only relevant when assessing whether government regulation has effected a taking by regulation of an acknowledged and existing property interest.[4] At this point it is not relevant to the

antecedent inquiry which the court must address: does plaintiff possess a property interest and, if so, what is the proper scope of that interest? Before plaintiff can argue whether the government has taken its property, it must first prove what it owns. The presence of "reasonable backed expectations" does not aid in establishing the existence of the property interest. If the plaintiff proves that it has property rights in the water and if the court finds that defendant took the property, *then* it may be appropriate to address "expectations."

### 2. Compensable Expectancy

In an argument whose theory is an identical twin to the "logical antecedent inquiry" argument, defendant contends that even if plaintiff does have the claimed vested stockwater rights, plaintiff cannot predicate a taking on regulatory actions predating its purchase of the property. Defendant asserts: "Plaintiff bought its interests subject to all existing statutes, regulations, and policies regarding grazing, as well as the terms and conditions of its permit, and had very specific notice prior to purchase that forage would be reduced." Def.'s Cross Mot. for Summ.J. at 55. Therefore, according to defendant's reasoning, plaintiff did not have a compensable expectancy in the property plaintiff claims the government took.

Additionally, plaintiff has no compensable expectancy in its grazing permit, defendant contends. A grazing permit is a license and not a property right. Therefore, defendant argues that plaintiff's claim has no compensable expectancy because plaintiff cannot claim any historically-rooted expectation that a reduction in grazing under a permit would be compensable.

Defendant argues that based on *Clawson v. United States,* 24 Cl.Ct. 366, 369–70 (1991), if plaintiff cannot first establish that the gov-

---

**4.** *Penn Central* laid out three factors that are relevant when determining whether governmental regulation results in a taking: 1) the character of the government action; 2) the economic impact of the regulation on the property owner; and 3) the extent to which the regulation interferes with distinct investment-backed expectations. *Penn Central,* 438 U.S. at 124, 98 S.Ct. at

2659, 57 L.Ed.2d 631. In that case the Supreme Court used "reasonable investment backed expectations" to assess whether Penn Central had suffered a taking when the government denied approval of Penn Central's plan to construct a 50–story office building. *Id.* In *Penn Central,* ownership or scope of the property right was not in dispute, as it is in the instant case.

ernment action impacted a compensable expectancy, the takings analysis stops at this point. Relying on *Florida Rock Indus., Inc. v. United States,* 21 Cl.Ct. 161, 168 (1990), *vacated on other grounds* 18 F.3d 1560 (Fed. Cir.1994), the defendant also claims that the analysis should not proceed to examine whether the government action impacted reasonable investment-backed expectations or economic viable use. In summary, defendant appears to argue that without establishing that the government action impacted a compensable expectancy, plaintiff cannot establish a regulatory taking.

Defendant argues that plaintiff's claim does not rise to the level of a physical taking because there was no physical occupation of plaintiff's water right. Defendant cites *Yee v. City of Escondido,* 503 U.S. 519, 112 Sup. Ct. 1522, 118 L.Ed.2d 153 (1992), for this proposition. Thus, defendant's position is that because there is no physical or regulatory taking, there is no taking.

In contrast, plaintiff argues that any of the defendant's claims that plaintiff cannot maintain a taking claim which involves a denial of use and physical occupancy of stockwaters must fail as a matter of law. Plaintiff states that the grazing permits are valid and subsisting. Therefore, denial of access to the vested water rights and use of the permits because of restrictive regulations is a mandate for compensation under the Fifth Amendment.

■ Again the court finds that both parties' application of taking law is incorrect. Defendant's overbroad argument that property rights ceased to exist with plaintiff's purchase of the property is illogical and inconsistent with well established property law. *See, e.g., Gladstone v. Gregory,* 95 Nev. 474, 596 P.2d 491, 492 (1979) (restrictive covenants run with the land). Under such logic, Congress could pass a law that stated that no one could build on their property. After all property had passed hands once, the right to build on one's property would be lost to everyone. Such an argument is not based on the property law of any American state or upon the Constitution of the United States.

In *Nollan v. California Coastal Commission,* 483 U.S. 825, 833, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677, n. 2. (1987), the Court briefly addressed the rights of a subsequent owner. In that case the Court stated, "So long as the Commission could not have deprived the prior owners of the easement without compensating them, the prior owners must be understood to have transferred their full property rights in conveying the lot." *Id.* Property rights run with the land and do not evaporate as a result of regulatory actions. Therefore, defendant's argument that plaintiff cannot "predicate a taking on regulatory actions predating its purchase of the property," is not a logical conclusion based on precedent.

Defendant may have been arguing a "notice defense," which this court has recognized. *Bowles v. United States,* 31 Fed.Cl. 37 (1994). In *Bowles,* the court explained that when a rational buyer has actual notice of a government land-use regulation, the rational buyer will presumably pay less for the property as a result of the encumbrance. *Bowles,* 31 Fed.Cl. at 51.

■ However, a notice defense is moot in this case because plaintiff is not arguing a taking of its property interest in the grazing permit. Plaintiff is arguing a taking of its water rights. Plaintiff's alleged water rights are a separate issue from the grazing regulations. It is true that in this case, as in *Hage,* the water rights and the grazing permit are intertwined. Until the court defines the scope of the property interest in water rights, however, the analysis of how or whether the government regulation impacts the water rights is premature.

Similarly, defendant's argument, that plaintiff has no compensable expectancy in the grazing permit, again misses the central issue before the court. The central issue before the court is whether plaintiff had water rights, and what is the scope of those rights. If the court finds that plaintiff had the property rights in question, then the court will address the issue of whether a government action without compensation impacted plaintiff's property rights in violation of the Fifth Amendment.

■ The court agrees with defendant that a reduction in grazing under a permit

does not provide an historically-rooted expectation for compensation because a grazing permit does not create a property right. However, plaintiff is alleging the taking of water rights, not rights in a grazing permit. The issue of whether a permit provides a compensable property right has been decided and is not the pertinent issue in this case. *See Hage*, 35 Fed.Cl. at 165–167.

■■■ Defendant's assertion that a taking cannot occur if the analysis does not fit into the two common, *per se* taking categories,[5] ignores that the core of plaintiff's claim rests in the Fifth Amendment. The United States Court of Appeals for the Federal Circuit has stated:

> Nothing in the Fifth Amendment limits its protection to only 'categorical' regulatory takings, nor has the Supreme Court or this court so held. Thus there remains in cases such as this the difficult task of resolving when a partial loss of economic use of the property has crossed the line from a noncompensable 'mere diminution' to a compensable 'partial taking.'

*Florida Rock Industries, Inc. v. United States*, 18 F.3d 1560, 1570 (Fed.Cir.1994) *cert. denied,* — U.S. —, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995). As that court noted, protection under the Fifth Amendment is not limited to the two discrete categorical takings mentioned in *Lucas*. This case, as the court found in *Florida Rock,* is one of the cases where the court is charged with resolving an area of taking law that has not been as fully explored as other areas.

Defendant rests its argument—that a taking analysis should halt when the plaintiff cannot establish that the government action impacted a compensable expectancy—on *Clawson v. United States*, 24 Cl.Ct. 366 (1991). In that case, the court explained that "[p]roperty interests 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Clawson,* 24 Cl.Ct. at 369 (quoting *Ruckelshaus v.*

*Monsanto Co.,* 467 U.S. 986, 1001, 104 S.Ct. 2862, 2872, 81 L.Ed.2d 815 (1984) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980)). Under the state law in *Clawson,* the court found that the plaintiff had no property interest because the government action pre-dated the filing of plaintiff's mining claim. Therefore, plaintiff never owned the property. *Clawson* does not stand for the proposition for which the government cites it. The case, however, does complement this court's reasoning: that before a taking claim can proceed in this case, the plaintiff must first establish that it does indeed own the property rights in question.

■■■ The regulations at issue in this case—grazing regulations—do not directly regulate the property—stockwater rights—that plaintiff claims was taken. The regulations may impact access, and, therefore, may be pertinent to an analysis of the scope and value of the stockwater rights. It is true that the government has the right to regulate grazing access on the public lands; however, such a right does not mean they can deprive landowners adjacent to public land from exercising their right to use their private property. Similarly, the government legally cannot deprive plaintiff of its rights to water without compensation, if the plaintiff actually has those rights.

Even though the defendant cannot transform private property into public property without compensation, plaintiff's claim of a taking based upon the government's denial of access to vested water rights through restrictive regulations is at this stage of the litigation premature. Rarely is a taking case suitable for summary judgment as a result of such fact intensive questions as exist in this case. After viewing the voluminous filings, the court finds that the question of whether plaintiff had a property interest in water based upon Nevada law that predates the creation of the Toiyabe National Forest, is a mixed question of law and fact. Western

---

5. In *Lucas* the Court stated that it has found "at least two discrete categories of regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the restraint." *Lucas,* 505 U.S. at 1015, 112

S.Ct. at 2893, 120 L.Ed.2d 798. These two categories of taking occur when the government either physically invades the property or when the regulation denies all economically beneficial or productive use of the land. *Id.*

water law is far from transparent. Therefore, the court seeks expert testimony at a limited evidentiary hearing on the scope and validity of plaintiff's claimed vested rights. The court denies defendant's motion for summary judgment regarding plaintiff's water rights taking claim.

### B. Ditch Rights-of-Way

Defendant argues that even assuming that plaintiff's have vested or decreed water rights to irrigation water in the Twin Rivers and Four Canyons, defendant did not take plaintiff's ditch rights as a matter of law. As in *Hage*, defendant argues that even assuming that plaintiff has a ditch right-of-way under the Act of 1866, the Forest Service may regulate and restrict activities beyond the scope of normal maintenance and repair. *See* 43 C.F.R. § 2801.1. Identical to *Hage*, defendant argues that plaintiff's activities went beyond "normal" maintenance and, therefore, defendant acted properly and reasonably by regulating plaintiff's actions on the public lands. In contrast, plaintiff argues that the defendant's position—that plaintiff does not have a taking claim because plaintiff did not obtain a special use permit— must fail as a matter of law.

As the court illustrated fully in *Hage*, if the court concludes that plaintiff owned ditch rights-of-way pursuant to the Act of 1866, the court must next determine the scope of those property rights. *Hage*, 35 Fed.Cl. at 173– 174. The plaintiff in this case, as in *Hage*, will have the opportunity at the evidentiary hearing to prove its ownership of vested ditch rights and that its desired use and maintenance of these ditch rights does not exceed the scope of its property interest, requiring a special use permit. If plaintiff can establish both facts, the court will allow plaintiff's ditch rights-of-way taking claim to proceed. Of course, as the court noted in *Hage*, although plaintiff may be allowed to go forward with its claim, it has a high burden to establish that the permit procedure in itself was so burdensome as to require compensation under the Fifth Amendment. *See Hage*, 35 Fed.Cl. at 164 (citing *Stearns Co. v. United States*, 34 Fed.Cl. 264 (1995)). *See also Loveladies Harbor, Inc. v. United States*, 15 Cl.Ct. 381, 386–87 (1988) (summary judgment denied), 21 Cl.Ct. 153 (1990), *aff'd* 28 F.3d 1171 (Fed.Cir.1994).

### CONCLUSION

The court denies plaintiff's and defendant's cross motions for summary judgment. The resolution of these motions, however, has narrowed and clarified the issues for trial.

The court shall hold a limited evidentiary hearing to determine whether plaintiff owns property rights in the claimed water and ditch rights-of-way and scope of those rights. If plaintiff proves vested rights in the water or in the ditch rights-of-way, then plaintiff may proceed to the liability portion of this taking case.

The court will hold a telephone status conference on June 11, 1996 at 4:00 p.m. EDT. The parties should be prepared to discuss a schedule for discovery and the evidentiary hearing in accordance with this opinion.

IT IS SO ORDERED.